THE MAYOR AND ALDERMEN OF JERSEY CITY

v.

PATRICK H. FLYNN et al.

[Decided May 2d, 1908.]

1. A city water-supply contract bound the city to take and use the water when the works were completed for a term of twenty-five years, and to pay therefor on a graduated scale by the million gallons, required the works to be so constructed and maintained by the contractor that the water should be free from pollution during the time the city should take it by the million gallons, contained an option to the city to purchase, and declared that, on notice of a popular vote of acceptance of the works by the city and the payment of the price, the contractor would sell to the city, provided the city should give notice within one year from the date of the contract of its intention to purchase, gave the city a reasonable time in which to test the works after completion and before acceptance thereof, and declared that so long as the city should continue to take water by the million gallons without purchasing the works the contractor should sell to no one else. A supplemental contract extended the time for completing the works and for testing the supply, and payment after completion and before acceptance thereof, and bound the contractor to begin to furnish water immediately on completing the work.—Held, that, under the original contract, the effect of a popular vote of acceptance and notice to the contractor was not to abrogate the provisions of the contract as to supplying water for the twenty-five-year term by the million gallons, and to put the city in the position of one who had merely agreed to purchase, but that the city was required to pay for the water by the million gallons until it actually took title and paid the price, and that this was not changed by the supplemental contract.

2. A bill filed by a city praying that defendants might be decreed, on payment by the city of such part of the price as might be ascertained to be due, to convey to it water works constructed by defendants under a contract, whereby the city was to take and use the water for a twenty-five-year term with an option to purchase, was not the equivalent of a tender of the price, and did not alter the contract rights of the parties and confer on the city the right to possession, which the contract only gave on payment or tender of the price.

3. Where specific performance, if decreed, is decreed on equitable terms, the letter of the contract will not be permitted to stand in the way of an equitable adjustment as to interest on the one hand and rents and profits on the other.

4. The rate chargeable for the forbearance of money is, in the absence of agreement, the legal rate.     .

5. Where a city failed to perform a water-supply contract binding it to take and use the water by the million gallons for a twenty-five-year term, but with an option to purchase, and in such event giving it an opportunity to test the works before acceptance, in that it did not tender so much of the price as was payable, the obligation to pay for the water by the million gallons did not terminate on the last day named for test and acceptance before purchase, but on the day of a decree on a bill by it to compel specific performance.

6. A company which had been furnishing a city with water joined with others who had contracted to furnish the city a new water-supply in an agreement with the city to continue to furnish it water until the city should obtain its new supply, but not beyond a designated date, and guaranteed that the new water-supply works would be completed to such an extent that the water could be turned on by a designated date, and undertook that, if not sufficiently completed, it would continue to deliver water until completed, but not beyond such designated date. The rate at which water was to be furnished was different from that at which it was to be furnished from the new supply.—*Held*, that the agreement to furnish water at the rate named was the agreement of the company which had been furnishing it alone, and could not be converted into an agreement obliging those who had contracted for the new supply to continue to furnish water at the same rate.

7. A stipulation that for each day's delay beyond the time for completing a water-supply works the contractor should pay $500 as liquidated damages, and not as a penalty, was not in fact a penalty, but liquidated damages, where, by failure to complete the water-supply works, the city would be deprived of the right of selling its surplus water to municipalities and other persons outside its corporate limits, and the damages which it would thereby suffer were altogether uncertain in amount and not readily susceptible of proof.

8. The construction to be put on a contract is the same, both in a court of law and of equity.     `

9. A city water-supply contract, giving the contractor a certain time "to complete the work and furnish the water," may reasonably be read to give him that time "to complete the work so as to furnish the water," and the contractor would only be liable up to the day it began to furnish the water and the works were capable of delivering the required amount, less the time that delivery was retarded by legal proceedings by the city, irrespective of the works being completed in every detail.

10. Contracts must have a reasonable construction and be read in the light of surrounding circumstances.

11. A stipulation in a city water-supply contract that the supply was to be free from pollution does not require that a river, which is a part of the supply, shall be free from pollution from its source to the point where it flows into the reservoirs, but means that the supply at the time it reaches the city shall be free from pollution.

12. A stipulation in a city water-supply contract that the water shall be pure and wholesome, and free from pollution deleterious for drinking and domestic purposes, does not require that the water shall be absolutely pure, of such purity as could be obtained in a laboratory; but all that is required is that it shall be "free from pollution deleterious for drinking and domestic purposes."

13. A city water-supply contract, declaring that the water proposed to be furnished was pure and wholesome and that the plan had been prepared so as to prevent all contamination thereof from any source, in accordance with the specifications, which were that the water to be furnished must be pure and wholesome for drinking and domestic purposes, requires water-supply works capable of preventing contamination from any source at any time under any conditions likely to occur, and works that may be effective under favorable conditions for a part of the year, but ineffective at other times, are not in compliance therewith.

14. Under a city water-supply contract, declaring that the water proposed to be furnished was pure and wholesome, and that the plan had been prepared so as to prevent all contamination from any source, in accordance with specifications, which were that the water to be furnished must be pure and wholesome for drinking and domestic purposes, the contractor was not bound to provide against future conditions; but the city would have to provide against them as occasion might require.

15. Evidence examined, and *held* to show that water-supply works constructed under a contract with a city were not of such a character as that they could be relied on constantly to furnish pure and wholesome water.

16. It is within the power of the court to decree specific performance, with an abatement in the price for that part of the thing bargained for which the vendor is unable to convey.

17. Evidence examined, and *held* not to show that a filter plant was indispensably necessary to a complete performance of a contract to furnish a city with pure and wholesome water for drinking and domestic purposes.

18. Under a city water-supply contract expressly declaring that the specifications and proposals were made a part thereof, which specifications contained the clause that the advertisement, the specifications, the "accepted proposals," all maps, plans, and drawings accompanying, attached to, or described therein, the specific contract, and the contractor's bond were to be considered essential portions of the complete contract, an undertaking to remove a rag mill, which was a possible source of pollution of the water-supply, contained in a letter written by the contractor's attorney, and which was signed by the contractor on the city's refusal to execute the contract unless he did so, was a proposal of the contractor, accepted by the city, and binding on the contractor.

19. Failure to "remove" a rag mill, in compliance with a city water-supply contract binding the contractor to do so, does not entitle the city to have the price or value of the mill deducted from the price of the

water-supply works, where the removal of the mill was stipulated for only that the purity of the water-supply might be conserved, and the city gets a supply free from pollution caused by operation of the mill in an objectionable manner.

20. The prohibition against polluting a stream which is a water-supply is against putting any polluting matter into a stream or tributary which furnishes a water-supply at any point whatever above the point at which the supply is taken, and without any reference to the question whether the stream appears to be or is in fact polluted at the point of intake.

21. A specification, made a part of a water-supply contract, provided that where a tunnel was in rock, if the bottom was sound and solid rock, it "may" be leveled up and smoothed with cement concrete, and that where the tunnel was in earth or unsound rock a brick invert "shall" be laid at the bottom. Another clause required care to be taken to leave the interior surface of the tunnel smooth and free from projections, and another clause provided that the tunnel should be brick-lined.—*Held*, that the only permissible departure from a brick lining throughout was where the bottom consisted of sound and solid rock, in which event it might be leveled up and smoothed with cement concrete, and that a gravel construction was excluded.

22. Where a city elected to take a water-supply works, the bottom of a tunnel of which was not constructed according to the contract, the rule applies that where a contractor has substantially performed his contract, though he has failed to do so in some minor particulars, he is entitled to the contract price less a fair allowance to make good the defects.

23. A specification, made a part of a city water-supply contract, provided that bidders must state a price at which the city could buy and own the works of a capacity of fifty million gallons daily, together with the water-supply, water rights, lands, reservoir sites, rights of way, and all assessments necessary to fulfill the requirements of that specification, and to the extent of seventy million gallons daily. In compliance with this specification the proposal was for water works and all appurtenances necessary to fulfill the requirements to the extent of fifty million gallons daily, together with the water-supply, water rights, &c., necessary to fulfill the requirements and to the extent of seventy million gallons daily. —*Held*, that the contractor was not obliged to do anything more than construct a dam which would hold back a fifty-million-gallon supply, and that he was not required to so construct the dam that by simply building on its top it could be raised so as to provide for a supply of seventy million gallons.

24. A city is not entitled to insist that a water-supply contract shall be specifically enforced by a conveyance of the water works to it, and at the same time to repudiate an agreement that, in the event of the completion of the water works before the claim of another to a part of the water-supply had been released or extinguished, the city should be entitled to retain out of the purchase price a certain sum until a decision of the highest state court adverse to such claim, or the delivery of a release thereof, or an abandonment of a canal by the one claiming the right to the water, and demand an additional deduction.

Heard on pleadings and proofs.

*Mr. George L. Record* and *Mr. James B. Vredenburgh,* for the complainant.

*Mr. William D. Edwards, Mr. William H. Corbin* and *Mr. Charles L. Corbin,* for the defendants.

STEVENS, V. C.

On August 1st, 1905, the complainant filed its bill against the defendants, Patrick H. Flynn and the Jersey City Water-Supply Company, praying that they might be decreed to convey to it the water works constructed by them, or so much of them as they were able to convey, upon payment by the city of such part of the consideration ($7,595,000) as might be ascertained to be due. The bill further prayed that the suits at law to recover the price of water that was being furnished by the million gallons should be restrained.

The suits were restrained on equitable terms, pending the decision on the merits.

Prior to October 12th, 1895, Jersey City had obtained its water-supply from the Passaic river, near Belleville. As the river water below Paterson had, by that time, become unfit for domestic purposes, Jersey City, on that day, contracted for a temporary supply to be furnished by the East Jersey Water Company. By this contract and by supplementary ones this supply was continued until May 23d, 1904, when the new supply obtained from the defendants' works was turned on.

The original contract looking to such a supply was made between the city and Flynn on February 28th, 1899. Flynn thereby agreed "to construct a new system of water works for Jersey City and to supply said city therefrom with pure and wholesome water" in two years and a half thereafter, *i. e.,* by August 28th, 1901. After doing some work he assigned the contract to the Jersey City Water-Supply Company. By a supplementary contract, made on March 31st, 1902, the time for completion was extended to December 25th, 1903. It was not, in fact, completed to such an extent that the water could be turned

on until May 23d, 1904. Since that time the city has received its water-supply from the new works, which are still in the possession of the water-supply company.

The water is taken from the Rockaway watershed, one hundred and twenty-two and one-half square miles in extent above the intake, or reservoir, at Boonton. Its principal sources are Green pond, Denmark lake, Split Rock lake, Dixon's pond, Shongum lake and other smaller ponds and brooks. Rising in the Longwood valley, the Rockaway flows in a circuitous course past the towns of Port Oram, Dover, Rockaway and Boonton, and it finally empties into the Passaic at a point about seven and a half miles (in an air line) above Little Falls, and about twelve miles (in an air line) above Paterson. The plan adopted was to construct a reservoir just below Boonton, which would be both an intake and a storage reservoir, capable of containing above the effluent pipes seven thousand three hundred and sixty-two million gallons, and capable of supplying fifty millions of gallons a day. Jersey City, at the time of the writing of this opinion, uses about forty millions of gallons daily. From this reservoir the water is conducted through a steel pipe and through tunnels to Jersey City by gravity. The old Belleville mains have been abandoned.

The case involves a variety of questions, nearly all of them depending upon the proper construction of the contract of February 28th, 1899, and of three other contracts supplemental thereto. Some of these questions are, by no means, easy of solution.

The contract of February 28th, 1899, is based upon the act of 1888 (*P. L. 1888 p. 366*). This act reads as follows:

"That it shall be lawful for the board of aldermen, common council, city council, aqueduct board, board of public works, water commissioners, township committee, town committee or other board, body or department of any municipal corporation in this state, having the charge or control of the water supply of any such municipal corporation to make and enter into a contract or agreement with any water company or other company, contractor or contractors for one year, or for a term of years, for the obtaining and furnishing of the supply, or a further or other supply of water to such municipal corporation, for the purpose of extinguishing fires and for such other lawful uses and purposes as may be deemed necessary or convenient; and any such contract and

agreement, when so made, shall be the valid and lawful contract of such municipal corporation, as well as of any such water company or other company, contractor or contractors, according to the tenor thereof, and the sum or sums of money in such contract agreed to be paid in each year by any such municipal corporation, or by any board, body or department thereof, or so much thereof as may be necessary, after appropriating to the payment thereof the water rents or proceeds of sales of water collected by such municipal corporation applicable to that purpose, shall be annually appropriated, levied, assessed and collected as a tax upon the real and personal estate within such municipal corporation and liable to taxation for other municipal purposes, and the said real and personal property is hereby made liable to and for the assessment and collection of such tax; *provided, however,* and it is hereby expressly enacted, that no such agreement and contract shall be made for a period longer than twenty-five years in any one term; *and provided further,* that in any municipal corporation having a board of public works and a board of finance and taxation, if the contract and agreement be made and entered into by any such board of public works, it shall not be binding upon such municipal corporation until the same shall have been approved by such board of finance and taxation; *and provided further,* that such contract may contain an option for the acquiring by such municipal corporation of the land, water and water rights for such supply, on terms to be fixed in said contract."

This act, it will be seen, authorizes two things—*first,* a contract for a water-supply to be furnished by the owner of the works for a term of not more than twenty-five years; *second,* a contract for an option for the purchase of the land, water and water rights (including, of course, the works erected in connection therewith). The validity and efficacy of this act was affirmed in *Slingerland* v. *City of Newark, 54 N. J. Law (25 Vr.) 62,* and in *Van Reipen* v. *Jersey City, 58 N. J. Law (29 Vr.) 262.*

The contract in question provides for a twenty-five years' supply and it also contains an option. It is admitted by both sides that the original contract as made conforms to the provisions of the act. By act of 1895 (*P. L. 1895 p. 775*) it was provided that the question of purchase, according to the option, should be submitted to a vote of the people of the city. This was done. The voters voted to accept, and formal notice of the result was given to the water company. Now, counsel differ widely as to the effect of this vote and notice upon the status of the parties. Counsel for the city contend that its effect was to abrogate or nullify the provisions of the contract in reference to the supply

·of water for a ·term of years and to put the city in the position ·of one who had merely agreed to purchase, while counsel for the water company contend that the provisions relative to the ·quarter-yearly payments of water continued in force until the price of the works ($7,595,000) was actually paid or tendered by the city. Obviously, this question can only be solved by con- ·sidering the terms of the agreement.

The agreement of February 28th, 1899, provides that the ·specification prepared by the city, on which the bidding took place and the accepted proposal, are to be regarded as a part of it.

The specification declares that the mayor and aldermen of Jersey· City will receive proposals for a supply of pure and whole- ·some water under the following plans: (Then follows the plan.) At the sacrifice of brevity, it will be necessary to set forth such ·of its provisions as throw light upon the point at issue. They ·are the following:

"The water must be delivered by gravity at Bergen reservoirs." (These were the old reservoirs in Jersey City into which the Passaic water ˙had been conducted from the intake at Belleville.) "The first works must be ·constructed with storage and intake reservoirs of sufficient capacity and so located as to be capable of collecting and delivering fifty million gallons daily, at all times."

"Whenever during the term of the contract, but prior to the exercise of the city's option to purchase, the city shall notify the contractor to increase the capacity of his water works, then the contractor shall imme- diately proceed to construct such additional storage and intake reservoirs as may be necessary, so located and of such capacity as to be capable, together with those previously constructed, of collecting and delivering seventy million gallons at all times."

"Bidders must state a price per million gallons for a supply of twenty- five million gallons daily; a price per million gallons for all in excess of twenty-five million gallons daily up to thirty million gallons daily," &c., &c.

"Bidders must also state a price for which the city can buy and own the water works of a capacity of fifty million gallons daily, together· with the water-supply, water rights, lands, reservoir sites, rights of way and all easements necessary to fulfill the requirements of this specification and to the extent of seventy million gallons of water daily; *said purchase to take effect on completion and acceptance of the works,* if the city shall give notice of its intention to purchase within one year after date of ·contract."

"The city will pay quarterly the sum due to the contractor at such de- positories as the contractor may designate and at such times as are agreed upon in the contract."

"If a contract is entered into, it will run for twenty-five years from the date of the contract, unless sooner terminated by a *purchase of the water works by the city as herein provided for.*"

On this specification Flynn's proposal was as follows:

"I hereby propose to provide a new supply of water for the following prices:

"For each million gallons of water furnished up to twenty-five million gallons daily, thirty-six dollars per million gallons. For each million gallons in excess of twenty-five million gallons daily, thirty-four dollars per million gallons daily," &c., &c. (up to limit of capacity of works).

"For the water works and all appurtenances thereof necessary to fulfill the requirements of these specifications to the extent of fifty million gallons daily, together with the water-supply, water rights, lands, reservoir sites, rights of way and all easements necessary to fulfill the requirements of these specifications and to the extent of seventy million gallons daily forever, which *purchase* can be made by the city when the water works are *completed and accepted* hereunder; provided, that the city shall give notice of its intention to purchase within one year after the date of contract, the sum of $7,595,000."

On this specification and proposal the contract was drawn. After binding the contractor to construct the works in strict conformity with the above specification and proposal, it continues:

"Such works shall be constructed and *maintained* by the contractor that the water delivered therefrom shall be pure and wholesome and free from pollution deleterious for drinking and domestic purposes, *during the time that Jersey City shall take water by the million gallons.* If such works and supply are purchased by Jersey City they shall be delivered to said city as a completed operating plant free from pollution as aforesaid."

In its third section it expressly provides for payment for each million gallons, as mentioned in the proposal.

Its fifth section reads as follows:

"The said contractor hereby covenants and agrees that he will upon the receipt of notice as provided in the specifications *and the payment of the purchase price,* sell and convey said water-supply with the appurtenances upon any of the following options."

Then follow the options mentioned in the specifications.

The sixth and ninth sections also bear upon the present inquiry.

"Sixth. It is understood and agreed in case the city shall give notice within one year from the date of this contract of its *intention* to purchase said water-supply and water works under said specifications, when the water works are completed and accepted, that then the city shall have such reasonable time to test said works and the water-supply *after* completion and *before the acceptance thereof for purchase* as Jersey City may deem necessary and reasonable for that purpose, provided such test shall not extend beyond a period of four years and eleven months from the date of this contract."

"Ninth. It is further understood and agreed that so long as *Jersey City shall continue to take the water by the million gallons without purchasing* the water-supply and works under the options aforesaid, no water shall be sold or furnished to any person," &c., &c.

It seems to me that these clauses, read consecutively, show a very clear and definite scheme, a scheme that may be stated in the words of the specification:

"If a contract (*i. e.*, a contract for the supply of water by the million gallons and containing an option) is entered into, it will run for twenty-five years from the date of the contract, unless sooner terminated by a *purchase* of the water works by the city as herein provided for."

What is the meaning of the word "purchase?" Is it used, inaccurately, as synonymous with agreement to purchase, or is it used in its proper signification of actual acquisition of full title for a valuable consideration? The contract itself gives the answer. It reads, in clause 5: The contractor hereby covenants that he will, "upon the receipt of notice" (*i. e.*, notice of the popular vote of acceptance) "and the payment of the purchase price, sell and convey said water-supply with the appurtenances to Jersey City." And in clause 6:

"In case the city shall give notice within one year from the date of this contract of its *intention* to purchase, when the water works are *completed* and *accepted*, then the city shall have such reasonable time to test said works and water-supply *after completion and before acceptance thereof for purchase* as Jersey City may deem necessary and reasonable for that purpose, provided such test shall not extend beyond a period of four years and eleven months from the date of this contract."

This clause only follows and amplifies similar language in the specification, "said purchase to *take effect* on completion and acceptance of the works if the city shall give notice of its intention to purchase within one year after the date of the contract."

Here, then, is an express declaration that the notice is not to be treated as a present purchase, but' as a notice of *intention* to purchase at a future time after completion and after test. The contract is to be performed in two years and one-half after its date, but the test may be made at any time within four years and eleven months. In other words, two years and five months may intervene between the completion and the test that is to precede the purchase. But during all this interval Jersey City must take the water by the million gallons, for here again the contract provides as follows:

"Second. Jersey City agrees to take the water aforesaid and use the same for its water-supply *when said works are completed* in accordance with the specification and plan No. 1, as soon as said contractor is ready to deliver pure and wholesome water from such supply.

"Third. Jersey City agrees to pay for such water when delivered as follows."

Then follows the price per million gallons on a graduated scale. It is hard to imagine how language could have been more explicit. Counsel for the city, when pressed to say what would be the city's obligation in case it actually took and used the water during the interval of two years and five months, made two suggestions—*first,* that the city was not obliged to pay anything; that the test that the city had the right to make was the receipt and use of the water, and that such test might be extended over the entire period, and *second,* that the express provisions of the contract were suspended during the two years and five months, and that the city was only obliged to pay as much as the water was reasonably worth, the assumption, without proof, being that it was reasonably worth less than the price fixed.

Neither of these suggestions finds any support in the language of the contract. They are directly opposed to the express stipulation that the city agrees to take and use the water as soon as the contractor is ready to deliver it and to pay for it according to the schedule prices.

Nothing is more obvious or more reasonable than the scheme as thus defined. Jersey City could no longer use its old supply.

It wanted a new one. It was for its advantage not to assume the cost of construction until it had given the works a trial, until it was demonstrated that the plan and supply were good— in other words, the risk was thrown upon the contractor. Is it conceivable that he, under these circumstances, would be willing not only to construct works costing over seven millions of dollars, from which he bound himself not to deliver water to anyone except Jersey City, but also to supply either gratis or without fixing any price, for a period of two years and five months, water worth over $800,000? The Jersey City officials had no such idea, in the first instance, for they paid, without objection, for two quarters, at the schedule rate.

But it is further argued that equity looks upon things agreed to be done, as actually performed, and that, consequently, equity considers the vendee as the purchaser of the estate sold, and the purchaser as a trustee for the vendor of the price. Counsel for the city contends that as a consequence of this doctrine (I quote from his brief)

"the city's rights reverted to the date of the contract and thereby the smaller and inconsistent contract to purchase water from this plant for twenty-five years was discharged and thereafter the contract to purchase alone remained."

This statement will not stand examination. It is true that, speaking generally, equity regards the vendee as a purchaser for whom the vendor holds the legal title in trust, but the doctrine is not carried to an unwarrantable extreme. It is kept within reasonable limits by the perfectly well-settled rule that in the absence of express stipulation the purchaser takes the rents and profits and pays interest on the purchase-money only from the time fixed for the completion of the contract; not from the time of its execution. *Fry Spec. Perf.* § *891; King* v. *Ruckman, 24 N. J. Eq. (9 C. E. Gr.) 298; DeVisme* v. *DeVisme, 1 McN. & Gor. 336,* and, as I shall show hereafter, not always as early as that. And again the court never applies the doctrine in such a way as to override the express stipulation of the parties. I have already shown that this requires the water to be paid for by the million gallons until the time of the completion of the purchase

by the transfer of the title and payment of the price. And so the express stipulation is in conformity with the rule of equity which would prevail in the absence of express stipulation on the subject.

Looking, therefore, at the original agreement alone, it is quite plain that the city was required to pay for the water by the million gallons at the schedule rates, until it actually took the title and paid the price.

But the works were not completed within the time agreed upon, and supplemental agreements were made. Do they lend countenance to the city's contention? By contract of March 31st, 1902, the time for the completion of the works was extended to December 25th, 1903, and the time for the testing of the works was extended to October 1st, 1905. There is nothing in this supplemental contract that lends added force to the argument of counsel for the city. It contains this provision:

"It is further agreed that the limit of the time for the testing of the works and water-supply and the payment therefor by the city after completion and before the acceptance thereof for purchase shall be extended, if desired by Jersey City, to a period not beyond October 1st, 1905."

Here again we see that the distinction between the time allowed for completing the works and the acceptance thereof for purchase is sharply indicated. That the contractor was bound to begin to furnish the water immediately upon completing the works appears from the clause following:

"The mayor and aldermen of Jersey City do hereby agree that the time to complete the work and *furnish the water specified* in said contract of February 28th, 1899, shall be and hereby is extended until December 25th, 1903."

The water to be furnished was necessarily the water which Jersey City had agreed to take and use and pay for as therein provided. In deference to counsels' earnest argument, I have spent perhaps more time upon this question than it may seem to deserve.

The next question is whether the position of the parties in reference to payments was altered by the filing of the bill. The

water, as I have said, was turned on on May 23d, 1904. The bill was filed August 1st, 1905, that is, *before* the time for testing and acceptance (October 1st, 1905) had expired.

The bill does not contain an offer to pay the whole price, but only such part of it as may be decreed to be due. It does not aver a willingness to pay any definite sum, and it does not charge that any particular sum is justly payable. It has never tendered any part of the price. This being so, can the mere filing of the bill be regarded as the equivalent of a completion of the contract? The question seems to answer itself. The mere filing of the bill is, certainly, not the equivalent of a tender of the price. It bears more resemblance to an application to this court to postpone payment until such time as this court may determine how much is justly due. The allegation is as follows:

"The voters of Jersey City having voted to purchase said water works, and the water works having thereafter been constructed for your orator under said contract, your orator became and is the owner thereof in equity and entitled to the possession thereof. Your orator is compelled for the reasons aforesaid to accept said water works, notwithstanding they are not completed in accordance with said contract. It desires to pay therefor but it should not be compelled to pay to the defendants said sum of $7,595,000 for the following reasons."

Then follow the reasons. The prayer is that this court may ascertain

"how much and what part of said water works system the said defendants can convey to your orator; and what part of the said consideration of $7,595,000 should be paid by your orator,"

and that Flynn and the water company

"may be ordered by decree of this court to convey to your orator said water works or so much thereof as they are able to convey upon payment by your orator of such part of said consideration as may be so ascertained."

The position of the city is, therefore, this: "I am not willing to take the works as you have constructed them and pay the contract price. I am willing to accept and take them as far as constructed for such part of the contract price as the court shall

decide that I ought to pay." It had the legislative authority to raise money by an issue of bonds bearing interest at five per cent., which, however, it is not authorized to sell below par. *P. L. 1895 p. 768.* Its water board has not as yet authorized an issue. Defendants' counsel say they cannot be sold. Whether they can or cannot, it is admitted that there has never, actually, been in the treasury money available for the payment.

If the city had, before suit, tendered the purchase-money, or so much as was really due, or, if after bill filed, it had paid the money into court, its position with reference to the question now under consideration would have been very different. But it has not. I do not see how, under these circumstances, the mere filing of the bill could be said to have altered the contract rights of the parties and to have conferred upon the city that right to the possession which the contract only gave upon payment or tender.

In *Reddish* v. *Miller's Executor, 27 N. J. Eq. (12 C. E. Gr.) 514,* the facts were these: An intestate had agreed to convey by a time fixed. Before that time he died. The vendee's assignees tendered the purchase-money on the day, but the widow and sole heir, having quarreled, refused to join in a conveyance, and the purchasers refused to take a conveyance from one alone. Then the vendor's administrator filed a bill. The chancellor decreed a specific performance and gave interest on the purchase-money from the date of the filing. This the court of errors and appeals said was wrong. Justice Van Syckel said: "Conceding that on the day the bill was filed R. and O. (the purchasers) should have accepted a good title if it had been offered; that they were bound to perform on that day if the other party was ready to execute the contract, it is obvious that by no fault of their own, but on account of the default of the other party they could not have obtained a title. If they had offered to consummate the contract on the day the bill was filed, or at any time before final decree, their offer would not have been accepted. It is not equitable, therefore, to regard the filing of the bill as the offer of a deed, because the parties who should have conveyed would not do so on that day, or at any time before, and equity could not compel a conveyance until the case was ripe for final decree. The filing

of the bill did not enable the purchasers to obtain possession of the land, nor give them any control whatever over it for the purposes of the plan they had adopted to dispose of it.  *  *  * The filing of the bill cannot be regarded in any just sense as an offer to make the title."

The principle upon which Justice Van Syckel decided the above case is directly applicable to this.

But if the contractual obligation to pay for the water by the million gallons did not terminate when the city notified the company of the popular vote, and if it did not terminate upon the filing of the bill, when did it terminate? There are two, and only two, possible periods. Either the last day named for test and acceptance (October 1st, 1905), or the date of the decree. As I have already said, *prima facie,* in the absence of stipulation to the contrary, the time fixed for the completion of the contract is the time from which the purchaser is entitled to the rents and liable for the payment of interest. But this rule has its exceptions, and the principle of one of them is, I think, applicable to the case in hand. It is this: Where the bill is filed by the vendor and his title is first made out (that is, shown to be good) in the master's office, the day when the title is made out is the day from which the purchase-money begins to bear interest. The case is one, of course, where, under the English system of conveyancing, the vendor is in fault for not having produced a good title prior to or at the time set for performance, and the vendee has refused to perform on that ground. Lord Cottenham thus states the matter in *DeVisme* v. *DeVisme, 1 McN. & G. 352:* "The vendors being in default, the delay having been occasioned by their not performing their part of the contract, are not to exact from the purchaser the payment of interest until the time they show a good title on their abstract. The effect of that is to postpone the day agreed on for the completion of the contract, until the time when the vendors put themselves right and show their title to be good."

The case in hand is much more complicated than that just cited. The complainant's failure to perform consists in not having tendered so much of the price as was really payable.

Its excuse is that it did not know how much to tender. But it has not only neglected to pay the price; it has advanced several claims that it has not made good by proof—claims, therefore, that the defendant was not bound to submit to. On the other hand, the defendant has insisted that it was entitled to the full purchase price. It has never indicated that it would take less. But the court finds that it was entitled to considerably less. The exact sum payable has, therefore, remained a matter of doubt until decree.

The matter may be viewed in another way. The water was turned on in May, 1904. The city had, therefore, a year and a half in which to make the final test and to determine for itself the sum which it thought itself at liberty to deduct for deficient performance, and it might have tendered the sum which it considered to have been due at its peril. It did not take that course. It chose, rather, to make its tests during the progress of the cause, and to let the court decide whether those tests showed complete performance by the water company, and what, in equity, it was bound to pay. Having thus sought, as far as it could, to postpone performance until decree; having thus refused to take the responsibility of tendering the money actually due, or of paying it into court, it is hardly in a position to say that it should have the same benefit that it would have had had it performed by the time prescribed by the contract.

There are many cases in which the question has come up. They show that in dealing with the subject the court does that which on the particular facts is equitable, unless it feels itself controlled by some stipulation so clear and positive as to preclude all discretionary action. *Williams* v. *Glenton, L. R. 1 Ch. Ap. 200,* and *Mayor of London and Tubbs Contract, 2 Ch. Div. 524 (1894),* are recent illustrations of such preclusion. On the other hand, *Sherwin* v. *Shakespear, 5 De G. M. & G. 517,* shows how the court does equity notwithstanding the strict letter of the contract. An extended review of the cases would be superfluous because we have a leading case in our own courts. In *King* v. *Ruckman, 24 N. J. Eq. (9 C. E. Gr.) 556,* the law was settled by the court of errors and appeals. There King sued Ruckman

for a specific performance of an agreement to convey several tracts of land, to some of which he had title and to some of which he had not. A part of the purchase-money was to be paid on June 1st, 1868; the rest, so far as it was to be paid in cash, on July 1st; the balance of the price to be then secured by a mortgage. The money was not paid on June 1st, 1868. Whether it was properly tendered was one of the questions in dispute. The chancellor thought it was not, and that time was of the essence of the contract. The court of errors and appeals thought it was, and that time was not of the essence of the contract. It accordingly directed a specific performance, as far as performance was possible, with an abatement, if equitable, of the price. The case came back to this court, *24 N. J. Eq. (9 C. E. Gr.) 298,* and Vice-Chancellor Dodd gave a specific performance with variations. It appeared that the vendor had remained in possession and that the rents were not more than equal to the taxes. One of the questions was whether Ruckman was entitled to interest on the purchase-money from the day fixed for the *completion* of the contract. It was held that he was not. Vice-Chancellor Dodd said: "It seems to me clear that Ruckman is not entitled to the interest and that the complainant is entitled to give the mortgage for the balance of the time it would have to run (five years) and on the terms it would have had, if given on the 1st of July, 1868, in pursuance of the contract." It will thus be seen that at the instance of the purchaser the contract was varied in two particulars. Interest was to run from the date of the decree and not from the time set for completion, and the mortgage given was to contain the same terms as to future payment of installments of the principal as it would have contained had it been executed at that time. The decree was affirmed on appeal. Chief-Justice Beasley, quoting from Lord St. Leonard, thus stated the rule: "Where interest is more in amount than rents and profits and it is clearly made out that the delay was occasioned by the vendor, the court gives the vendor no interest, but leaves him in the possession of the *interim* rents and profits." Then he says: "It has been intimated that in order to put the rule in force it was necessary that the vendor should not only be in fault but that such

fault should be willful. I think there is not the least foundation for such a contention. Indeed, the rule has been almost universally applied in those instances where there was no suggestion of anything intentionally wrong in the conduct of the sale of the property. It has received its most frequent exemplifications in cases in which the delay in completing the contract has arisen from the discovery of latent defects in the title. On such occasions the vendor was no further in fault than every one is in fault who undertakes to do what he afterwards discovers he is not prepared to do. In such cases, the vendor is simply blameable for having, perhaps, omitted to have his title looked into with sufficient care. These illustrations make it demonstratably clear that the point as to the degree of the culpability of the vendor has not in the least affected the course of equity in the particular in question."

The above cases show very clearly that where a specific performance is sought, and where, if decreed, it is decreed on equitable terms, the letter of the contract is not allowed to stand in the way of an equitable adjustment, as to interest on the one hand and rents and profits on the other. Had the city on this bill taken the position that it was not obliged to pay interest on the purchase-money from October 1st, 1905, but only from the time of the decree, the above case of *King* v. *Ruckman* would have been directly in point. But it takes no such position. On the contrary, it takes the position that it should *not* be obliged to pay for the water by the million gallons at the schedule rates; that it *should* be obliged to pay interest on the purchase-money from the time of the popular vote; not, indeed, interest upon the sum named in the contract, but upon such sum as this court shall find to be due; and, further, that this interest should not be interest at the legal rate of six per cent., but at some lesser rate, to be determined arbitrarily by the court. Singularly enough, the water company, on the other hand, against its apparent interest, insists that water rents at the schedule rate should continue to be paid until decree; that not until then should interest upon purchase-money begin.

The following table will show how the matter stands. The amounts are computed at the schedule rates:

| *4 Buch.* | Jersey City *v.* Flynn. |
|---|---|

| | |
|---|---|
| Quarter ending August 23d, 1904 | $105,089 |
| Quarter ending November 23d, 1904 | 106,846 |
| Quarter ending February 23d, 1905 | 115,744 |
| Quarter ending May 23d, 1905 | 105,733 |
| Total for the first year | $433,412 |
| Quarter ending August 23d, 1905 | $106,548 |
| Quarter ending November 23d, 1905 | 107,995 |
| Quarter ending February 23d, 1906 | 111,659 |
| Quarter ending May 23d, 1906 | 106,791 |
| Total | $432,993 |
| Quarter ending August 23d, 1906 | $114,957 |
| Quarter ending November 23d, 1906 | 117,321 |
| Quarter ending February 23d, 1907 | 123,043 |
| Quarter ending May 23d, 1907 | 117,085 |
| Total | $472,406 |
| Interest at 6 per cent. on $7,595,000 | $455,700 |
| Cost of operation (as agreed by parties) | 50,000 |
| Total | $505,700 |

The cost of operation is, of course, added to the interest, be-
cause, on the assumption that the city is to be regarded as in pos-
session, it would be paying what the company is now paying to
make that possession effective and useful.

The above table shows that if Jersey City should pay interest
at six per cent. and be charged with a sum equal to the cost of
maintenance, it would pay more than it would if it paid for the
water by the million gallons. The interest is computed, in the
table, upon the whole contract price, but with the allowances
made, the result is the same.

If the payment is not to be made by the million gallons at the
contract rate, can it be made in any other way or at any other
rate? Counsels' suggestion is that Jersey City should only pay
what the water is fairly worth. There is no evidence that even
if this proposition is sound, the contract rate is not reasonable.
The contract rate is, for each million gallons up to twenty-five
millions, $36 per million gallons; for each million gallons in
excess, up to thirty millions, $34; for each million gallons in ex-

cess of thirty millions, up to thirty-five millions, $32; for each million gallons in excess of thirty-five millions, up to forty-five millions, $24, and for all beyond, $20. Judging by the evidence and by the reported cases, this price is reasonable. There is, at least, no evidence to the contrary.

That the city would, in any event, be chargeable with interest at the legal rate is, I think, perfectly plain. The rate chargeable for the forbearance of money is, in the absence of agreement to the contrary, the legal rate. *Jersey City* v. *O'Callaghan, 41 N. J. Law (12 Vr.) 349,* is in point. It was there held by the court of errors and appeals that where damages for breach of contract are to be assessed or where an equivalent is to be given for the use of money forborne, the statutory rate is the rate to be computed. If, then, interest be given at all, it would be given at the rate of six per cent.

The matter, then, stands thus: It is for the interest of Jersey City that she should be charged with water rents and not with interest up to the time of decree. The particular equities of the case and the principle of *King* v. *Ruckman,* require such a charge and the defendants concur in demanding it.

I will notice, very briefly, one other point made. It appears that prior to March 31st, 1902, the East Jersey Water Company was furnishing Jersey City with water at the rate of $35 per million gallons. On that day it joined with Flynn and the Jersey City Water-Supply Company in an agreement with Jersey City to continue to furnish it at that price until the city should have obtained and put in use the new supply, but not beyond March 1st, 1907. It was stipulated that it (the East Jersey company) would guarantee that the supply company would construct and complete the water works to such an extent that the water could be turned on from the new source on or before March 1st, 1904, and that if the works were not sufficiently completed and the water so turned on by that date, the *East Jersey company* would continue to deliver the temporary supply of water from March 1st, 1904, "until such new supply was so turned on, at the rate of $353,800 per annum until March 1st, 1907." As I have already said, the water was actu-

ally turned on on May 24th, 1904, and Jersey City paid at the rate so stipulated for only two months and twenty-four days.

The city argues that if it must pay under the provisions of the contract, it should only be required to pay this fixed item of $353,000 per annum. But it seems to me very clear that the agreement to furnish the water at these figures was the agreement of the East Jersey company alone. It was to last for a perfectly definite time, viz., until the Jersey City Water-Supply Company had so far constructed its own works as to be able to turn on its own water. I am quite unable to understand how an agreement by the East Jersey company can be converted into an agreement obliging the water-supply company to continue to furnish water at the same price, more especially when, as I have shown, there was an express agreement between Jersey City and the water-supply company for a different rate. The figures named by the East Jersey company laid the foundation for a temporary order made *pendente lite* in a case where everything was in dispute. They cannot be used as a substitute for the contract right of the parties.

## Liquidated Damages.

The question next to be considered arises in respect of the city's claim for liquidated damages.

In the specification which, as I have said, is made part of the contract, there are the following clauses:

"The contractor will be allowed two years and six months from the date of contract to complete the work and furnish the water specified."

"For every day's delay beyond the term of contract, the contractor shall pay the City of Jersey City the sum of five hundred dollars per day as liquidated damages and not by way of penalty."

The contract was not completed within the time specified, and the work begun by Flynn was continued by the Jersey City Water-Supply Company.

By agreement dated July 8th, 1901, reciting that Flynn had assigned his contract to that company, the contractors, who are stated to be Flynn *and* the Jersey City Water-Supply Company,

state that it is and remains their duty to furnish Jersey City with the water-supply originally contracted for, and that the modifications contained in the second contract shall not relieve Flynn or his sureties from furnishing and delivering to Jersey City the quantity and quality of water required by the original contract, nor from constructing it in accordance with the original contract as thereby modified. The modifications do not affect the present question, but a further contract, dated March 31st, 1902, contains, among other things, the following clauses:

"Whereas the water works provided for in said contracts have not yet been completed and it is apparent that the same cannot be completed for a long time to come, and the said party of the second part (who are stated to be Flynn and the Jersey City Water-Supply Company) desire the party of the first part (the city) to extend the time for the completion of said works and the fulfillment of said contracts as hereinafter provided and to waive any claim for liquidated or unliquidated damages for delays, *until the expiration of such extended time.*"

* * * "Now therefore in consideration of the premises and of one dollar to them in hand by the party of the second part, the Mayor and Aldermen of Jersey City do hereby agree that the time to complete the work and furnish the water specified in said contract of February 28, 1899, shall be and hereby is extended until December 25, 1903, and that the payment of five hundred dollars per day as liquidated damages for delay under said contracts and specifications shall be incurred or reckoned only from and after December 25, 1903."

It is so clear that the Jersey City Water-Supply Company, as well as Flynn, is, under these stipulations, answerable for such liquidated damages as may be awarded that no argument is attempted on that head. The contention is that, notwithstanding the explicit language employed, "the sum of $500 per day as liquidated damages and not by way of penalty," the sum named was, in fact, a penalty and not liquidated damages. It would be quite impossible for the parties to have expressed themselves with greater clearness. They not only say that the sum named *is* liquidated damages, but they also say that it is *not* a penalty. The argument must, therefore, be that the parties are prevented by some rule of law or equity from so stipulating. I know of no such rule nor have I been referred to any.

The cases on the subject are very numerous. Certain rules have been laid down, some of which have been doubted and others

of which are perfectly well settled. I shall refer to them only in so far as they illustrate the present question. They are elaborately considered by the appellate division in *Wallis* v. *Smith, 21 Ch. Div. 243,* where the Master of the Rolls, Jessel, classifies them as follows:

*First.* Cases in which a sum of money is stated to be payable, either by way of liquidated damages or by way of penalty, for a breach of several stipulations, one of which, at least, is for the payment of a sum of money of less amount. In this case the sum is regarded as a penalty for a breach of any and all of such stipulations and only the actual damages can be recovered in respect of any of them. *Astley* v. *Weldon, 2 B. & P. 346,* and *Kemble* v. *Farren, 6 Bing. 148,* are leading cases.

*Second.* Cases in which a sum of money is stated to be payable by way of liquidated damages for defaults or breaches of covenants other than for the payment of money. With respect to such there is or may be a distinction founded upon the trifling character of one or more of the breaches. If the contract contains a variety of stipulations, and they are all of equal or nearly equal importance, the sum stated is regarded as liquidated damages, and the whole of it is recoverable for a breach of any one of them. This was the precise point decided in *Wallis* v. *Smith.* If, on the other hand, the contract contains a variety of stipulations and they vary substantially in importance, or relate to very trifling matters, whether certainly ascertainable or not, then it appears to be unsettled, so far as the English cases are concerned, whether the sum named is to be regarded as a penalty properly so-called or as liquidated damages properly so-called. The dicta on this point are conflicting and they do not require consideration here.

*Third.* Cases in which the sum is called liquidated damages and is given for a single breach. Here again we have to distinguish. The breach may consist in the non-payment of a smaller sum of money. In this case there is no conflict of authority. The sum named, however, designated, is a penalty. Then again, the stipulation, if broken, may result in damages uncertain in amount, and, necessarily, very insignificant—in the words of Lord Eldon (*Astley* v. *Weldon, 2 B. & P. 351*), "so

gross that a man would start at the bare mention of it." Here, too, the sum, however designated, is, undoubtedly, a penalty. Jessel mentions another class which I need not refer to because it does not bear upon the matter in hand. The class to which the present case belongs has been the subject of consideration by the court of errors and appeals. The rule applicable to it is thus expressed by Justice Dixon, in *Monmouth Park Association* v. *Wallis Iron Works, 55 N. J. Law (26 Vr.) 132:* "When damages are to be sustained by the breach of a single stipulation, and they are uncertain in amount and not readily susceptible of proof under the rules of evidence, then, if the parties have agreed upon a sum as the measure of compensation for the breach and that sum is not disproportionate to the presumable loss, it may be recovered as liquidated damages." This is a very guarded statement, more so, I think, than may be found in many of the judicial utterances on the subject and as favorable to the water-supply company as it would be possible to phrase it. It is stated, in somewhat different terms, in a subsequent case in the same court by Judge Vroom (*Robinson* v. *Centenary Fund, 68 N. J. Law (39 Vr.) 723*) : "The rule may then be fairly stated to be that when the term 'penalty' is used in the agreement, and a single act is forbidden, if upon breach it is not possible to ascertain the damages, then the sum named as penalty may be recovered, if on any reasonable view of the case the damages might equal that sum." In this latter case, notwithstanding the fact that the parties used the word "penalty," it was construed to mean "liquidated damages." The case is the more noteworthy for that reason, for if in this class of cases, as in every other, the object being to ascertain the intention, some regard must be paid to the words used. The word "penalty" is generally used in contradistinction to liquidated damages. Says Lord Escher in *Law* v. *Local Board of Reddilch, 1 Q. B. 127 (1892)* : "The contract goes on to say that the sums so forfeited may be recovered as and for liquidated damages." I do not think much reliance ought to be placed on those words, for, even if the sums were called penalties, the same considerations might be applicable, but I do not think that they ought to be left out of account altogether.

The two New Jersey cases cited were cases at law and not in equity, but that cannot make any difference. The construction to be put upon the language of contracts is the same in both courts. As to the matter of consideration, "the rule," says Pomeroy (*Eq. Jur.* § *926*), "is entirely settled that *mere* inadequacy, that is inequality in value between the subject-matter and the price, is not ground for refusing the remedy of specific performance. In order to be a defence, the inadequacy must either be accompanied by other inequitable incidents or must be so gross as to show fraud."

Judged by the foregoing rules, I do not see why the sum named as liquidated damages for delay of completion should not be payable. There are three aspects of the matter. In two of them there was no injury; in the third there was. *First,* there was no pecuniary injury because of the city's being obliged to get its water from the East Jersey company. It was consuming, in December, 1903, less than thirty-five millions of gallons a day (the exact amount does not appear), and in July, 1905, about thirty-two and one-half millions. If it paid for this water at the schedule rates ($36 up to twenty-five million gallons; $34 for the excess up to thirty millions, and $32 for the excess over thirty millions up to thirty-five millions), it would have paid more than it was paying for the water received from the East Jersey company, viz., $35 per million gallons for all amounts. It would have paid considerably more than it was paying after March 1st, 1904, and until the Rockaway supply was turned on, viz., at the rate of $353,800 per annum. The city can claim no actual damage on this score. *Second,* no real injury resulted from the fact that the water supplied from December, 1903, to May, 1904, was taken from the East Jersey works above Little Falls, and not from the Rockaway. The proof does not show that the East Jersey company's water was not as pure and wholesome as the Rockaway water. It was water that came, in part, from the Rockaway, lower down, and from other unpolluted sources. The injury on this head is hardly more than fanciful.

The *third* ground of injury is, I think, substantial. It is that by the delay in completing the works, Jersey City was deprived

of the right of selling its surplus water to municipalities and other persons outside of its corporate limits. In *East Newark* v. *New Jersey Water-Supply Co. et al.*, an interpleader suit to which Jersey City was a party, *67 N. J. Eq.* (*1 Robb.*) *266,* I came to the conclusion that while Jersey City could not first buy and then sell water by the million gallons, in other words, could not buy, merely for the purpose of selling, yet that if it had a water-supply of its own more than sufficient for its needs, it could sell the surplus water within the limits of the counties of Hudson and Bergen. My opinion was concurred in by the court of errors and appeals, on appeal. *68 N. J. Eq.* (*2 Robb.*) *783.* Both this and other reported cases show not only that Jersey City had statutory authority thus to dispose of its surplus water, but that while it was using its former supply, obtained from the Passaic above Belleville, it exercised its privilege and sold that surplus to various towns. It appears, therefore, that Jersey City would have had no authority to sell such water as it was receiving from the East Jersey Water Company to persons or towns outside of its limits, even if, as is not likely, the East Jersey company would have been willing to furnish it for that purpose, but if the water-supply company had completed its contract by December 25th, 1903, it could have, at once, paid the price and taken over the works and been in a position to compete with the East Jersey company for the patronage of persons and corporations in the counties mentioned. The reported cases show that in some instances Jersey City had been getting as high as $90 per million gallons for the water thus supplied. Now, Jersey City would have had at least fifteen million gallons of surplus water thus to dispose of. If she had been able to dispose of it at even a $35 advance per million gallons, she would have received for it $525 per day—the liquidated damages being $500 per day. I do not, of course, wish to be understood as asserting that it is likely that she would have at once found purchasers for this amount of water, or for anything like as much. But I do say that it was quite within the bounds of possibility that she might have found purchasers for a considerable amount of it and at prices higher that she was herself then paying. It will, of course, be argued that,

judging from her indisposition to take any steps towards raising and tendering the price before she commenced this suit, it is unlikely that she would have reaped any substantial benefit from her mere legal right to pay and take immediate possession. But it can hardly be said with any show of plausibility that because Jersey City failed or refused to accept and pay for works that were not, in fact, complete—I mean complete in the sense of providing against those sources of pollution which I find she was bound to provide against—therefore, I am to assume that if the contract had been fully and completely performed, she would have been equally dilatory. It would have been for her interest, avoiding captious objections, if she could have found customers for her water, to have taken the works at once.

It cannot be doubted that the parties contracted together in view of a known situation. Jersey City was, and for many years had been, a competitor of the East Jersey and of its subsidiary companies. The damages which Jersey City would suffer by delay from this or any other cause were altogether uncertain in amount and not, in the words of Justice Dixon, "readily susceptible of proof under the rules of evidence." It was the very situation in which the courts have allowed the parties to assess their own damages in advance. The original contracts stipulating for these damages were prepared by counsel of great experience. That it was intended to assess these damages in advance there can be no manner of doubt, for it is expressly provided that the sum agreed upon shall be paid "as liquidated damages and not by way of penalty." But the case does not rest here, for the works not being completed within the time limited, the parties in their supplemental contract of March 31st, 1902, took cognizance of the fact that liquidated damages might be insisted upon for past delays and so they use this language:

"Whereas for the purpose of inducing the City to grant the extension of time hereinafter mentioned and to waive all claims for liquidated or unliquidated damages for delay during such extended time and *as a consideration therefor* they have secured the consent of the East Jersey Co. to continue the temporary supply," &c.,

and then they go on and expressly provide

"that the payment of $500 per day as liquidated damages for delay under said contracts and specifications shall be incurred and reckoned only from and after December 25, 1903."

The parties were dealing at arms' length. They had competent advice. They were peculiarly well informed in respect to the matters they were contracting about and they were dealing with a subject incapable of being reduced to a certainty by any legal rule for the assessment of damages. No oppression, no unconscionable circumstances are shown; no inequality such as to shock the conscience of the chancellor. It cannot be asserted with certainty that the damages named might not, under certain contingencies, have equaled the damages that might have been actually sustained. Under these circumstances, it seems to me that it is the duty of a court of equity to specifically enforce the contract and not to nullify it.

One other question remains. For what period shall the damages be assessed? The main object was to get the fifty million gallon supply. For this purpose it was not very material that the last stone should have been put in place; the last bank sodded, and the last nuisance removed. In view of the paramount object to be attained, I think that the words "the contractor will be allowed two years and six months from the date of contract *to complete the work* and furnish the water," may reasonably be read, "to complete the work so as to furnish the water." The company began to furnish it on May 23d, 1904. The works were then capable of delivering fifty million gallons per day, and so the damages would be computed from December 25th, 1903, to that date, were it not for the fact that the city, by reason of legal proceedings taken in respect of the tunnel, retarded delivery five or six days. These, I think, should be deducted.

I may add that the abstract question how much water Jersey City will on conveyance acquire the right to subtract, either by reason of its riparian ownership of the land conveyed or of any legislative grant, license or authority, is not raised by the pleadings and has not been argued or considered.

*Efficiency of Reservoir as Sedimentation Basin.*

I now come to what is, undoubtedly, from a sanitary stand-point, the most important question in the cause, and that is whether the water company has provided Jersey City with a water-supply such as the contract calls for.

As to the amount of the supply, there can be no question. It is not disputed that the works are capable of furnishing fifty millions of gallons a day, and that if enlarged, they will be capable of furnishing seventy millions. It is the *quality* of the supply, under certain conditions, that is disputed. Are the works of such a character as that they can be relied upon constantly to furnish pure and wholesome water? It is the evidence with relation to this question that has filled most of the four thousand printed pages of testimony. Much of that part of it, however, relating to certain minor nuisances existing on the watershed at the time the witnesses testified has become irrelevant, the nuisances having now been removed.

On the scientific questions involved, the expert witnesses on both sides agree in their views to an extent that is all the more surprising, because the science of bacteriology, originating in the wonderful discoveries of Pasteur and Koch, dates its origin from a period within the last thirty years.

The Rockaway watershed is one hundred and twenty-two square miles in extent. The river rises in the Longwood valley to the east of Lake Hopatcong. It flows past Wharton, Dover, Rockaway and Boonton before it reaches the reservoir. The population per square mile above Boonton is one hundred and sixty-nine, regarded as a very large population for a watershed used to furnish a water-supply.

In addition to the towns named there is the mining camp of Hibernia which lies upon a brook that empties into the Rockaway six or seven miles above the reservoir. There are also many large factories along the river. In its natural state the shed is capable of furnishing water of excellent quality. As it is, the water as it enters the reservoir is much contaminated. The reservoir itself, a little over two miles long and a mile wide, is an

artificial structure, damming up the river just below Boonton, and its greatest depth is about eighty-five or ninety feet. It contains above the lowest gate, from which water can be delivered, seven thousand three hundred million gallons. This is a supply for one hundred and forty-six days if fifty millions of gallons a day be taken, or a supply for one hundred and four days if seventy millions be taken, assuming that during those periods nothing flows in. But this is an impossible assumption, for even if no rain should fall during all those days the ground water would still, in gradually diminishing quantities, continue to flow first into the river and then into the reservoir and thus add to the water-supply stored up.

The water is conducted from the reservoir to Jersey City, part of the way, through a single steel pipe six feet in diameter, and part of the way through a conduit and tunnel eight feet and six inches in diameter, the distance being twenty-two and six-tenths miles. Reaching Jersey City it flows, in part, into two small reservoirs, and, in part, for the use of Jersey City Heights, directly into the city pipes. There is no pumping, the entire supply being delivered by gravity. The height of the reservoir spillway above high tide is three hundred and five and one-half feet, and the bottom of the lowest gate or effluent pipe two hundred and fifty-six and six-tenths feet. It takes seventeen hours for water, at the present rate of consumption, to flow from the reservoir to Jersey City.

It is a fact admitted by all the witnesses on both sides that the water of the river as it enters the reservoir is polluted to such an extent as not to be potable. The defendants' insistment is, however, that the reservoir acts as a sedimentation basin and that the water when it reaches.Jersey City is free from all objectionable impurities and of excellent quality.

It is not denied by the city that the water, when it reaches Jersey City, is ordinarily good. It is, however, insisted that it is not always so; that the sedimentation to which it is subjected is at times imperfect, and that in certain conditions of wind, temperature and flow, particularly in times of freshet, the water passes so rapidly from the river, across the reservoir, to the effluent pipes that it has not time to settle, and that it reaches

Jersey City with many of its impurities still in it. The insistment is, therefore, that the reservoir, as a mechanism for purification, is unreliable, and not such as stipulated for by the contract.

I shall consider, first, what the contract requires. The first clause provides as follows:

"The, contractor agrees to construct a new system of water works for Jersey City and to supply said City therefrom with pure and wholesome water in strict conformity with said specifications and his proposal under plan No. 1. \* \* \* Such works shall be constructed and maintained by the contractor that the water delivered therefrom shall be, pure and wholesome and free from pollution deleterious for drinking and domestic purposes, during the time that Jersey City shall take water by the million gallons. If such works *and supply* are purchased by Jersey City they shall be delivered to Jersey City as a completed operating plant free from pollution as aforesaid."

The contractor thus refers the matter to his proposals under plan No. 1. Referring to this plan (made part of the contract) we read as follows:

"There will be tributary to the storage reservoir the whole flow of the Rockaway River, having a watershed and gathering grounds of $122\frac{1}{2}$ square miles." \* \* \*

"The water proposed to be furnished is pure and wholesome. *The plan has been prepared so as to prevent all contamination thereof from any source* in accordance with the specifications."

The specifications provide as follows:

"The water to be furnished must be pure and wholesome for drinking and domestic purposes."

"The City will agree to exercise on demand of the contractors all its legal powers to prevent pollution of waters tributary to the proposed works, but all expenses attendant upon the prevention of such pollution shall be borne by the contractor."

The contract further provides as follows:

"Eighth. It is further understood and agreed that all sewers and sewage disposal works constructed or arranged for by the contractors to prevent pollution or to carry off pollution existing in the watershed, shall under said specifications and plans be so constructed and arranged for by him that in the event of the purchase of the water-supply and

plant by Jersey City under any of the options aforesaid, the operation and maintenance of such sewers and sewage disposal works for the purposes aforesaid shall not be a charge upon and expense to Jersey City."

Finally, the specifications provide:

"All powers possessed by the City shall be exercised in aiding such prevention. *The City shall not be obliged to accept any plant* or water therefrom *until the supply is free from pollution.*"

These are the principal provisions on the subject. There are others of minor importance, which do not in anywise lessen the obligation of the contractor; if anything, they tend rather to emphasize it.

Contracts must have reasonable construction and must be read in the light of the surrounding circumstances. The evidence shows that before the contract in question was executed, the city authorities visited the watershed and actually saw what the conditions were. They knew that the river flowed through a thickly populated region and that some pollution at the points where the population was thickest was inevitable. I think it is quite plain that the contention of counsel for the city that because it is provided that the supply is to be free from pollution and because the river is a part of that supply, therefore, the *river* must be free from pollution, from its source to the point where it flows into the Boonton reservoir, is untenable. In view of the evidence, the city would be demanding an impossibility. I think the contract means that the supply, at the time it reaches Jersey City and is delivered into the reservoir or pipes there, must be free from pollution. For example, if after the water should leave the Boonton reservoir but partially purified, it should be subjected to the action of a filter plant, established at any point along the route, and be there freed from pollution, I have no doubt the terms of the contract would be fully complied with.

Again, the requirement that the water must be pure and wholesome does not mean that it shall be absolutely pure—of such purity as could be obtained in a laboratory—all that is required is that it be "free from pollution deleterious for drinking or domestic purposes."

There is still another observation that I must make on the argument addressed to me by counsel for the water company, and that is this: It is, in the event of a purchase by the city, the *supply* that is required to be free from pollution and not the water that has from day to day been thus far delivered. In the words of the contract

"if such works and *supply* are purchased by Jersey City they shall be delivered to Jersey City as a completed operating plant, free from pollution as aforesaid."

This supply must be delivered free from pollution, not half the year or three-quarters of the year, but *all* the year; not in times of low water or moderate flow, when the reservoir is still and sedimentation uninterrupted, but also in times of high wind and freshet. If the evidence shows that the works are, as they stand, adapted to the delivery of pure and wholesome water only during part of the year, no matter how large a part, then the contract has not been completely performed. Suppose, for instance, it were shown that on two or three days of the year the water at the Jersey City intake contained typhoid germs in such number as to cause epidemic and that this condition of things was not the result of accident but of a lack of precaution, such as reasonable engineering and sanitary practice required, then I apprehend the language of the contract would not have been satisfied, for it says, "the water proposed to be furnished is pure and wholesome," "is" being here used in the sense of "will be." It was not the affirmation of a then existing fact, for the fact, as both parties knew, was otherwise. The water of the river was then grossly polluted. The contract continues "the plan has been prepared so as to prevent *all* contamination thereof from *any* source in accordance with the specifications," which were that "the water to be furnished must be pure and wholesome for drinking and domestic purposes."

Now, it was argued for the water company that the contract should be construed in the light of conditions then existing, and that Jersey City must have known that if it accepted the Rockaway, it would get water somewhat polluted.

This argument would be unanswerable if the contract had been only that the contractor would impound the water in a large reservoir and deliver it to Jersey City. If Jersey City got polluted water it would get just what it had bargained for. But both parties knew that the Rockaway at and below Dover was highly polluted. The contractor knew it better than the city. The evidence is that the stream as it flowed past Dover was then little better than an open sewer. It was in view of these known conditions that the parties contracted, and what the contractor expressly contracted to do was to deliver pure and wholesome water from a polluted stream. "The plan," he says, "has been prepared so as to prevent *all* contamination from *any* source."

The company proceeded on the theory that it *must* furnish *pure,* not on the theory that it *could* furnish polluted water. It did not wait to see whether the pollution at Dover and other places would make itself apparent at Jersey City. It began at once to remove many of the sources of pollution, and the only question is whether it has gone far enough.

There is one other remark that, in order to avoid misapprehension, I wish to make before considering the evidence. The company is not bound to provide against that which may arise in the future; in other words, against future conditions. Jersey City will have to provide against them as occasion may require. For example, if the present population of the watershed does not create a situation calling for the installation of a filter plant, the company is not obliged to furnish it, merely because, when the population increases, such a plant may be a necessity.

To sum up, the contract requires that the plant (using that word in its broadest sense) shall at all times and on all occasions (barring accidents and occurrences that could not by the exercise of reasonable foresight and care be provided against) be constructed or adapted to use, so as, in the words of the contract, "to prevent all contamination from any source." The thing to be delivered is a plant capable of preventing contamination from any source, at any time, under any conditions likely to occur, and not a plant that may be effective under favorable conditions for a part of the year, but ineffective at other times.

As this is a very important part of the case, I may be permitted to illustrate further.

Drought in summer is no uncommon occurrence; heavy rain following drought is no uncommon occurrence; high winds accompanying rain is no uncommon occurrence. If the plant be capable of delivering pure and wholesome water in ordinary weather, but not on the happening of the occurrences mentioned, either separately or together, then I take it that the plant would not be so completed as to meet the requirements of the contract.

With this view of the legal aspects of the case, I proceed to a consideration of the evidence. It is so voluminous that it will not be possible, within the limits of an opinion, to do more than summarize its more important features.

No fault is found with the construction of the reservoir as a piece of masonry. It is admitted to have been extremely well built. It contains as much water as was bargained for. It is hardly conceivable that up to the limit of fifty million gallons a day it could ever, under any circumstances of drought, be exhausted. The proof shows, too, that, in general, the reservoir does act effectively as a sedimentation basin, and that when the water reaches Jersey City it is of excellent quality. It has been on trial since May 23d, 1904, and up to the close of the evidence last June (1907) the plant has, for much the greater part of the time, delivered water satisfactory in quality. The statistics show that, since Jersey City has ceased to take its water from the lower Passaic, there has been a great decrease in the number of typhoid cases, and that the yearly average of deaths from that disease has, for the last four years, compared favorably with that of those cities the purity of whose water-supply is undoubted.

This, at first blush, seems to be pretty satisfactory evidence of the effective working of the plant. For the reasons that I am about to state, it is not conclusive. It does not necessarily follow that because the works may be capable of furnishing from thirty-five to thirty-eight millions of gallons of pure and wholesome water, therefore it is capable of furnishing fifty millions; nor does it necessarily follow that because the water has been pure and wholesome in the practical absence of water-borne diseases

on the watershed, therefore, the water might not be contaminated if such diseases prevailed.

Within the last thirty years science and experience have revolutionized the ideas of sanitary experts on the subject of water-supply. Repeated instances here and in Europe have shown that water admirable in appearance may contain the germs of typhoid and of other water-borne diseases in such numbers as to cause epidemic. It used to be a favorite theory of sanitary and hydraulic experts that running water purified itself. Experience has shown that it is not running water but still water that tends to do this. It is agreed by the experts on both sides that if water be allowed to stand for a sufficient length of time whatever pathogenic germs may be contained in it will die or disappear. None of these experts put the time under forty or fifty days, and several of them do not regard six months as too long. Disease germs have been carefully studied by bacteriologists who have, among others, been able to isolate the typhoid germ, cultivate it and study its peculiarities. Its proper habitat is found to be only in the human intestine. There it thrives and multiplies, as nowhere else, except under artificial culture. Millions of these germs may be discharged by a single patient, and some of them, the hardiest, will survive in water for weeks and months. Consequently, if the *fæces* of a patient be allowed to go into a stream from which a water-supply is taken they may be carried to the consumer, and if taken through the mouth may, in their passage through the intestine, attach themselves to it and multiply, and after a period of incubation (about ten days) the patient begins to exhibit those symptoms which are characteristic of the disease. This is no theory. It is an established fact admitted by all sanitary experts. The *Plymouth Case,* mentioned several times in the course of the testimony, is a remarkable illustration. The *fæces* of a single patient, thrown upon the ground during the late fall and frozen there, were in the spring washed into a brook which contributed to a water-supply and one-tenth of the entire population contracted the disease. In this case enough of the germs to produce the result survived in the ice for a period of four months. Several other striking instances are mentioned in the evidence. Doctor Leal, one of the officers of the

defendant corporation, himself an eminent sanitary expert, testifying to the time the germs will survive outside the human body, says:

"I think within the first five days fifty per cent. would die; I think within ten days ninety per cent. would die; I think within three weeks ninety-nine per cent. would die and the other per cent. might live for several months."

This statement is not dissented from by the experts for the city. Thus, Mr. Whipple says:

"If we assumed a certain number of germs put into the Rockaway river water, they would die somewhat rapidly at first. I mean, many of them would die out rapidly and some would live longer; others would live still longer; and a few might live for a number of months; but the number that did so remain would be small compared with the number that was put in."

The experts for the city, however, point out that where it concerns a matter of millions in each stool the residuum surviving would be by no means insignificant. Mr. Whipple says that he has seen urine that contained a billion germs in a single discharge.

The theory is, that when these germs escape from their natural habitat in the intestine, their environment becomes unfavorable and hence they tend to die off. Professor Sedgwick, of the Boston Institute of Technology, thus states the matter:

"Once they begin to travel through soil pipes and sewers, their food becomes scarcer and less available, and when finally they mingle with the waters of the lake, which are relatively pure and destitute of organic matters, their pabulum must be distinctly scanty. At the same time, in sewage and in the lake, they are subject to the influence of gravity which tends to draw them down into the deeper, quieter layers and finally into the mud at the bottom, while predatory imfusoria running through the water, may devour them altogether. Lastly, if they tend to float or linger on the surface, they may there suffer from the germicidal action of the rays of light and perish."

In addition to what is here stated, several of the witnesses are of opinion that the longer they remain out of the intestine the weaker and less virulent they become, and, therefore, the less likely to cause disease. Now it is on this theory that still water

is seen to be a better purifier than running water, but in order that still water may, so to speak, do its work, it must have time. A running mountain stream may carry the germ and be the vehicle of disease fifty miles below the point at which it was discharged into the water. Hence the theory of sedimentation.

It may be asked why, if the entire body of water be infected, everyone who drinks it is not made sick. The answer is that some subjects are more susceptible than others; that the majority of healthy persons appear to have the power to resist the attacks of the micro-organisms or to neutralize their poisons.

There is no doubt that in a certain sense and to a certain extent running water does tend to purify itself. It is a matter of common observation that if foreign matters, whether factory waste, sewage or surface water, be discharged into a stream, that stream will gradually clear. The heavier particles held in suspension, tend to sink because of their greater specific gravity. The substances held in solution may undergo chemical reactions among themselves and be precipitated; the sunlight and the oxygen of the air exert their influence and so it comes to pass that after water, not too highly polluted, has flowed for a considerable distance, it is, to all appearances, clear and pure. Now, what bacteriology has added to our stock of knowledge is this, that water apparently pure may be infected with germs that, introduced into the system, produce disease and death, and that running water will not kill them. It will rather serve as a vehicle to transport them long distances. How many diseases are thus water-borne is not as yet definitely known. The more recent investigations seem rather to add to their number than diminish it. Professor Sedgwick says:

"We have had a good deal of new light in the last two or three years, and as I said in my direct testimony, from the diarrhoeal group, including typhoid, cholera, gastro-enteritis, dysentery, &c., we have got considerable evidence that perhaps nearly all infectious diseases, the germs of which might find their way into sewage and so into water, may be to a little extent carried by water."

Professor Winslow thinks that the germ of para typhoid may be carried by water, and that epidemics of diarrhoeal disease may be traced to it. Dr. Leal admits that cholera, no less than

typhoid, is a water-borne disease; he thinks that diarrhœa may be caused by water, though not a water-borne disease, and he says that he cannot say whether dysentery is a water-borne disease or not, and he does not believe that anyone else can.

Throughout the testimony will be found constant reference to the presence of b. (bacilli) coli in the water. These exist in large numbers in the intestines of warm blooded animals, including man. They, or most of them, do not cause disease. One of the bacteriological methods of determining the purity of a water-supply is to determine the number of these b. coli in a cubic centimeter (c.c.) of the water or in some decimal part thereof. If the number is found to be large, it indicates the presence, to an undesirable extent, of animal matter, discharged from the intestines. It does not necessarily, or even usually, prove the presence of disease germs. It merely shows that if the animal, including man, that gave off the b. coli happened to have some water-borne disease, then the same water which conveyed the b. coli would probably bring the dangerous germ, or, putting it in another way, it would show that the method of purification employed had not freed the water from intestinal products; that they had neither settled nor been destroyed in their progress toward the consumer. These b. coli are exceedingly minute. The typhoid bacillus is one twenty-five thousandth of an inch in diameter, but several times longer than it is wide. It and the b. coli cannot be seen by the naked eye until they are—in bacteriological phrase—cultivated. The cultivation consists in putting a measured portion of the suspected water on a plate containing some substance upon which they will thrive and increase. If present, they will multiply with great rapidity. Each bacillus will divide and grow and subdivide until a "colony" appears on the plate, easily discernible by the naked eye. The number of colonies counted on the plate indicates the number of bacilli in the given quantity of water.

By this method alone the typhoid bacillus could not be differentiated from the other and harmless bacilli. Such differentiation is made by further tests unnecessary to describe.

Reference will also be made to bacteria. These, as I under-

stand the evidence, are microscopic organisms, some harmful, most of them harmless, found in water, and whose count affords an indication of its purity. The term includes *b. coli*, but is much more comprehensive.

We have now reached a point when the precise question at issue can be understood. The contention on the part of Jersey City is that the conformation of the reservoir is such that, in times of freshet, polluted water will pass so rapidly from the river to the reservoir outlet that there will be no time for proper sedimentation; that if there are pathogenic germs in the river when it enters the reservoir they will be carried across it in two or three days, and be borne to Jersey City within seventeen hours after they leave the reservoir gate.

It will be proper, in the first place, to consider more particularly the character of the water to be purified. The Rockaway is a comparatively small stream, with enormous variations of flow. Its lowest flow, as shown on the Cook chart for the year 1905-1906, was thirty-two million; its highest, eight hundred and ninety-nine million gallons per diem. Of the four towns that it passes, the most considerable is Dover, with a population of          .   Dover is built up on both sides of the stream and in places the ground slopes rapidly toward it. It has no sewer system, and the contents of the cesspools, uncemented, leach into the adjacent soil. Boonton, built upon the side of a high hill, with its natural drainage toward the river and its factories on the Cooper-Lord property almost overhanging, are within a mile or two of the reservoir. Smaller towns and factories are found along the stream and its tributaries. The droppings of animals on the numerous roads throughout the watershed, and the water flowing off the manured fields are likewise sources of pollution. There is comparatively little forest and, except in the Longwood valley, not much unused land. These conditions are in contrast with those obtaining on the Pequannock. In view of this situation, it will not be difficult to understand why the experts on both sides agree that the water as it enters the reservoir is not potable.

The experts tell us just how the water is contaminated. Mr. Whipple, the city's expert, says:

"I should say the water was contaminated to a considerable extent for the reason that the number of bacilli was very large for a river of this character, and that the number of coli present was very large and incidentally that the amount of chlorine was above normal for that region and also because the water has continuously a mouldy odor."

Dr. McLaughlin was the bacteriologist constantly employed by the water company to test the quality of the water, both where it flowed into the reservoir and at the tap at Jersey City. His analyses do not differ materially from those of Mr. Whipple. On his direct examination, counsel asked the question:

"*Q.* Would it be safe in your opinion, doctor. to deliver water from the Rockaway river at any point below the town of Dover and above the headquarters of the Boonton reservoir—that is, from the plain river— and send it to consumers without purification?
"*A.* It would not be possible. It would be dangerous."

Dr. Leal, testifying on behalf of the water company, says in answer to the question:

"*Q.* Doctor, in your opinion, is the flowing water of any river in a populated district proper to be taken for a potable water-supply, without first being brought into a reservoir, or in some other way treated?
"*A.* No, it would be utterly unsafe and unjust to do it. To take water from a running stream, draining a populated watershed and delivering it directly to the consumer—that would be dangerous and inexcusable."

Professors Winslow and Sedgwick and Mr. Kuichling testify substantially to the same effect.

We start out, then, with the admitted fact that the water of the Rockaway as it enters the reservoir contains germs that, if taken into the system, are a menace to health. The question, then, is whether the reservoir itself is an effective instrumentality for getting rid of them. The company has provided no other. As I have already said, it takes only seventeen hours for the water to flow through the pipes from the gatehouse or outlet of the reservoir to Jersey City.

Now it is manifest that if the river water, in considerable quantities, can pass from the river to the gatehouse in two or three days, or even a week or two, it can carry with it living germs, dangerous to life and health, if those germs have been discharged into the stream.

10

The city has sought in various ways to show that the water does so pass. I will first advert to the shape of the reservoir and to the points at which the water enters and leaves it. The following sketch taken from the sanitary map sufficiently depicts the situation:

The bridge across the river is about nine thousand two hundred feet from the Parsippany dam end. It is about three thousand nine hundred feet from the gatehouse and three thousand four hundred feet from the spillway or overflow. The distance from

the gatehouse to the spillway is about one thousand three hundred feet. From a bacteriological standpoint it is unfortunate that the exit of the water is not at or near the Parsippany dike. It would then have flowed through the whole length of the reservoir and more time, necessarily, would have been had for sedimentation. But at the Parsippany end it is shallow, and if the water were discharged there, Jersey City would not have the benefit of the water stored for times of drought. Whether the water will flow from the mouth of the river to the gatehouse in a longer or shorter time will depend largely upon conditions. It might occur to anyone, at first blush, that because the water is being constantly discharged at the gatehouse there would be a constant current between the two points mentioned. But the aperture through which it is discharged is only three feet long by six inches wide. The current created in so considerable a body of water by such an aperture would necessarily be very small. The water, of course, would flow along the line of least resistance. Some of it, for that reason, would, when the reservoir was full, flow toward the spillway. The greater the volume of water in the river the greater would be this flow. From an inspection of the Cook diagram of the flow of the river for the year 1906, I should judge that its mean flow throughout the year was over one hundred thousand gallons per day. But the river varies greatly. On nine occasions in that year for a period of several days at a time its flow exceeded three hundred and fifty millions, and on two occasions, eight hundred millions. From thirty-five to thirty-eight millions are taken by the pipe, and so on such occasions the greater current would be toward the spillway. It is at least certain that the water that enters the river would, because of this situation, tend rather to flow toward the northeasterly end of the reservoir than toward the Parsippany dike, and this tendency would be aided by the contour of the bottom. The foregoing diagram shows in a rude way the ancient bed of the stream, and so, the deepest part of the reservoir. It is between the spillway and the gatehouse, but nearer the spillway. The contour lines shown on one of the maps indicate the existence of comparatively high ground to the right of the ancient river bed, shortly after it flows into the reservoir, and this, too, would tend to divert all

but the upper stratum of the water from the Parsippany end.
It is to be borne in mind, however, that even when the river
is discharging into the reservoir one hundred millions of gallons
a day, it encounters a volume of over seven billions of gallons,
or seventy times its own bulk. When a very large volume of water
is flowing in the river there would be a tendency to run down hill,
so to speak, and spread out in every direction. But this tendency,
too, might be counteracted by the wind. A difference of tempera-
ture between the upper and the lower strata of the water would
originate local currents and the wind would cause others. It
will thus be seen that the problem presented is exceedingly
complex; so complex that Mr. Hering, a noted hydraulic engi-
neer, called by the company, declared himself unable to solve it.
It was attempted by means of floats of varying length, sunk be-
neath the water at different points to determine how the currents
chiefly ran. These experiments were not carried on for such a
length of time and under such conditions as to prove anything
very definitely. Mr. Hering said it was his firm conviction that
float experiments do not give a true idea of currents. Counsel
did not attempt to obtain from him, except in this general way,
his opinion of the result of the experiments of Mr. Bardner, who
made them for the company, and of Mr. Watson, who made them
for the city, but Mr. Kuichling, the city's engineering expert,
said:

"The experiments of January 16th (Mr. Watson's), of which there
were two, and the first six experiments of December 5th, 1906 (Mr.
Bardner's), show conclusively that there was a persistent sub-surface
current from the mouth of the river where it enters the reservoir, down
stream and across the reservoir and thence down the reservoir to the dam
and gatehouse. In both of these cases the direction of the wind was
opposite, or nearly opposite, to that of the float. * * * The figures
show an enormously wide difference between these actual observed facts
and the opinion expressed by Mr. Hering on purely theoretical grounds
as to the rate of speeds of currents in the reservoir."

The allusion here is to Mr. Hering's statement that under
certain hypothetical conditions (which, however, he admitted
would not be likely to exist in fact) the water, if in a condition
of quiescence, would take eighty days to pass from the river to the
gatehouse. The value of this statement by Mr. Hering, as proof
for the company, is greatly lessened by his further statement:

"In times of flood the conditions would be quite different.   \*   \*   \* I have not been able to satisfy myself just how many days it would take the water to flow from the mouth of the river to 'the intake under these freshet conditions, because it is an extremely complicated problem, but I would say it would take a number of days; just how many, I could not say."

"Q. More than a week?

"A. I cannot change my answer. I don't know whether it would be more or less than a week. That, of course, only applies to those times when freshet water goes into the reservoir in large flows."

All the experiments made by Bardner, except the last series taken on December 14th, were made when the wind was light and but little water flowing in the river. On December 14th, however, the volume of water flowing in the river was much greater (one hundred and thirty-four million gallons), and there was a steady breeze blowing all day from the east, northeast— that is, directly from the dam to the river. It is unfortunate that he did not then put his floats into the water between the river and the gatehouse or spillway, as Mr. Watson did later. He merely contented himself with putting them in the middle of the lake where they went with the wind and proved practically nothing.

This much would seem to be certain: That the current, such as it is, on the principle that the water goes along the line of least resistance, necessarily tends to flow from the mouth of the river toward the gatehouse and spillway. If more water is flowing over the spillway than through the gatehouse then the current would be more pronounced in that direction. If the wind is blowing hard from the northwest this tendency would be augmented. The larger the volume of water flowing in the river the stronger the current. It nowhere appears in the testimony how far down these currents would extend, so far as they are set in motion by the passage of the water toward the spillway. It is at least probable that the friction of the upper currents upon the lower, created either by a considerable wind or by a freshet, would tend to set the lower currents in motion in the same direction, in accordance with the result of Mr. Kuichling's observations in Lake Michigan, and that these currents would be directed toward the gatehouse rather than toward Parsippany dam.

There is another fact which seems to me to possess some significance. Mr. Cook, an hydraulic engineer by profession, a gentleman of much experience, having the actual superintendence of the reservoir and more familiar with the conditions existing there than anyone else, did not testify on this important subject, although he was called more than once on other subjects. Nor did Mr. Gardner, the president of the defendant company, also an engineer. What Dr. Leal and Dr. McLaughlin, neither of them experts so far as this matter is concerned, said, I shall consider later on, when I contrast their evidence with that of the bacteriologists called by the city.

There is a fact in this connection which seems to me to be very strong indeed; I called attention to its significance on the argument, and counsel for the water company could not, so far as I could see, explain it away. In the freshet of 1893 and during one hundred and eight consecutive hours, or nearly four and a half days, there was discharged at Boonton nine thousand eight hundred and eighty-five million gallons. The reservoir contains, above the lowest effluent pipe, seven thousand three hundred million gallons. What would have become of the water in the reservoir had it then been full? It is absurd to suppose that this immense volume of water would have flowed over the top of the water already there and left it undisturbed. It would undoubtedly have mingled with it and very largely displaced it. There can be no question that in two or three days some of the inflowing water would have reached Jersey City. It will, no doubt, be said that this was an exceptional flow, but the fact is that a very similar freshet occurred only a year or two before.

I will take, however, what was admittedly a normal year—in fact, a year of very moderate and very even flow. The flow for 1906 is illustrated by Mr. Cook on a diagram. It appears therefrom that on March 4th and 5th it was about nine hundred million gallons per day; on March 6th, six hundred million, and on March 7th, four hundred million. In other words, nearly two thousand eight hundred million of gallons flowed into the reservoir during those four days. This was considerably more than one-third the contents of the reservoir above the lowest point of discharge. Now, considering with what velocity the

freshet must have entered the stream and how the contour of the bottom must have given direction to its currents, how the friction of the upper strata would have acted upon the lower, is it conceivable that a considerable portion of the river water would not have found its way to the gatehouse within a few days? This freshet occurred in the early part of March. If coincident with a thaw, then the water would have contained the animal matters which had accumulated on the surface during the freezing weather.

The question will at once suggest itself, whether the observed facts accord with this, *a priori,* conclusion. I think it clear that they do.

In the first place, the results of examinations of the water after it reached Jersey City, both Mr. Whipple's results and Dr. McLaughlin's, show the number of bacteria to be very variable. Mr. Whipple, the principal expert witness for the city, made analyses of the water during 1904 and 1905. He says that the number of bacteria at the point of discharge in the small aqueduct on Jersey City Heights varied from one hundred and twenty to two thousand five hundred per cubic centimeter, and being asked by the water company's counsel for the average he said it was six hundred and forty-two; that fifty-three per cent. of the samples gave positive tests for colon bacillus in one cubic centimeter, and that twenty per cent. of the samples gave positive tests for *b. -coli* in one-tenth of a cubic centimeter. In 1905 the results were better. The bacteria varied from two hundred and ten to two thousand four hundred, the average being seven hundred. Four and a half per cent. of the samples gave positive tests for *b. coli* both when one cubic centimeter and when one-tenth of a cubic centimeter were used.

Dr. McLaughlin's tables show like differences. From the printed tables, it appears that between May 24th, 1904, and January 1st, 1905 (omitting the months of July and August, when no examinations were made), the number of bacteria varied from fifty on December 26th to three thousand seven hundred on June 27th. On no two successive weeks were they the same. In 1905, omitting three weeks in July and all of August, the numbers varied from thirty in July to one thou-

sand three hundred in January. In 1907, they varied from ten in June to four hundred in December. *B. coli* were discovered in one cubic centimeter three times in 1904; twice in 1905 and four times in 1906.

The last test by Dr. McLaughlin in 1906 was on December 23d. He then found two hundred and forty bacteria present in one cubic centimeter and *b. coli* present in ten cubic centimeters. Within three days thereafter (December 26th) Professor Winslow analyzed the water. He found two hundred bacteria present in one of the small reservoirs (reservoir 2) on Jersey City Heights, and three hundred in the other (reservoir 3). On the same day he found *b. coli* present in both, in a single cubic centimeter. In March, 1907, he made two analyses on two successive days. On March 19th, he found in reservoir 2, in the morning, one thousand bacteria, and in the afternoon, one thousand two hundred; in the other, seven hundred and six hundred. On March 20th, he found in reservoir 2, seven hundred in the morning and eight hundred in the afternoon; in the other, three hundred and nine hundred. On March 19th, in reservoir 2, he found *b. coli* present in one cubic centimeter in two samples and in one-tenth of one cubic centimeter in another sample. In reservoir 3, he obtained a similar result.

These analyses show that when the water reaches Jersey City it contains many more bacteria on some days than it does on others. In other words, that the sedimentation is not always complete. The full significance of these variations will be more apparent when we consider them in connection with Dr. Leal's statement with respect to the bacteria that are found in the filtered water after it passes through the filter plant at Little Falls. "We don't care so much about the rate of efficiency, but we want less than one hundred bacteria. If it is more than a hundred we add a little more sulphate of aluminum." Dr. Leal's evidence on this point will be given more at length in another connection.

There being then considerable variations in the number of bacteria found in the water at the tap in Jersey City and in the small reservoirs there, the question that next suggests itself is

whether there is any observed connection between increase in the number of *b. coli* and bacteria there and freshet flow. This increase does in fact appear to be marked and diagrams have been prepared to illustrate it. It is unfortunate that our data are somewhat defective, for two reasons—*first,* because Dr. McLaughlin made his tests from water drawn from the tap at Christ Hospital and not from the Jersey City reservoirs. I have already said that as a matter of law, the water company was bound to deliver water that was pure and wholesome at these reservoirs, or, so far as it did not pass through them, at the point where it passed from the pipes of the water company into the service pipes of Jersey City. The evidence indicates that the water is a little better after it flows through the city's pipes. This would be especially true of the water flowing out of the Jersey City reservoirs, for in that case there would be some little additional sedimentation. Consequently, Dr. McLaughlin's results are a little too favorable for the water company.

The data are, *secondly,* defective because not made by Dr. McLaughlin oftener than once a week. Suppose a heavy rain on the first day of the month and no analysis until the seventh. If the water does, in fact, pass from the mouth of the river to Jersey City in two or three days, the analysis would not necessarily show an increase in bacteria. The storm water might have had four days in which to settle or to become more diluted with the waters already in the reservoir. Hence, Dr. McLaughlin's analyses might not, and on the assumption I have made, often would not, indicate the full extent of the pollution. Keeping these things in mind, let us look at the data such as we find them. At the beginning and end of the entire period we are assisted by the analyses of Mr. Whipple and Professor Winslow. One other preliminary observation may be made. When a rainfall succeeds a period of dry weather it finds the air itself full of dust and the ground contaminated to a greater or less extent with fecal matter and garbage, the amount of contamination depending, of course, upon the length of the drought and upon the density of the population. I exclude from view altogether the case of sewers constructed to carry off sewage,

for upon this watershed there are none. The first rain, if at all heavy, carries a large proportion of these impurities into the stream. If it continues to rain, the river water, while it may be colored by the vegetation of peaty bogs, &c., gradually becomes purer. It is the first heavy rain succeeding a period of drought that is, from a bacteriological standpoint, most to be feared. If the drought has been sufficiently prolonged and the reservoir drawn down in consequence, then the mouth of the Rockaway is nearer the dam and the water entering it has a lesser volume of settled water with which to intermingle. This condition of affairs was remarkably illustrated by what occurred in September, 1904, when the reservoir had not yet filled. Here we have Mr. Whipple's figures to supplement Dr. McLaughlin's. On September 15th, there occurred a very heavy rainfall of five inches. On the day previous, Mr. Whipple found in the Jersey City reservoir, five hundred and twenty bacteria per c.c., and on that day, eight hundred and fifty. On September 16th, the number rose to one thousand and seven hundred, and on September 17th, to two thousand and sixty. The following day (September 18th) was Sunday and no test was made. On Monday, September 19th, the bacteria had fallen to six hundred and ninety in the small reservoir. But Dr. McLaughlin also made a test of the water at Christ Hospital on that day, and whereas on September 14th his analysis showed at the tap only two hundred and seventy-five (against Mr. Whipple's five hundred and twenty at the reservoir), on September 19th, his test showed seven hundred and fifty and the presence of *b. coli* in one c.c. Notwithstanding, therefore, the additional purification, if any, that the water had undergone in the Jersey City pipes, the rise in the number of bacteria was very marked. It is difficult to draw any other inference from these facts than that the influence of the storm began to be felt in the Jersey City reservoir the day after it began, and that two days after it began it was still more marked, and that two days after that it was clearly perceptible at Christ Hospital. Of course, we would have had still more light thrown upon the matter if Dr. McLaughlin had tested the water between September 14th and September 21st.

. The next heavy rain (three and a half inches) occurred on October 21st. Mr. Whipple's table does not extend beyond September, but Dr. McLaughlin's analysis, made October 25th, shows that whereas on October 19th, there were only one hundred and ten bacteria found, on October 25th, four days after the rain, the number had increased to eight hundred, and again *b. coli* were present in one c.c. On November 1st it fell to one hundred and twenty.

These were the two heaviest rainfalls of the year. In the following year there was a rainfall of two and a half inches on January 7th, and the number of bacteria rose to the unusual number of one thousand three hundred. The rainfall may have been accompanied with a thaw. There was another rain on January 12th, and on January 17th the number still stood at one thousand three hundred. How they stood in the interval we can only guess. In February and March the numbers varied. The precipitation was not great and some of it was probably snow. The number of bacteria was considerably higher in March, when the melting snow caused the river to rise, than it was in February. It is quite in accord with previous results that five days after the river was highest in the reservoir the number of bacteria was slightly greater than at any other test time in either of these two months. The rains for the rest of the year were not very heavy, the heaviest (two and a half inches) being on September 4th and 12th. On September 7th the bacteria were one hundred and thirty; September 12th, one hundred and twenty, and September 18th, one hundred and ninety. The rise on September 18th occurred four or five days after the water in the reservoir was at its highest, but the difference in the number of bacteria is too slight to afford ground for any reasonable inference.

The year 1906 was characterized by very moderate rainfalls— I should say unusually so, for on only two occasions throughout the year did they amount to two and one-half inches. There was less variation in the number of bacteria than in the two years prior. It is for this year that Mr. Cook, on behalf of defendants, has furnished us a diagram in which he compares the flow of

water in the reservoir with the number of bacteria found at the tap. His comparison terminates in November.

In December, 1906, we have for the first time Professor Winslow's figures. In consequence, apparently, of the melting of the snow that had fallen during the month, the reservoir was at its highest, according to the diagrams both of Mr. Cook and Mr. Whipple on December 22d. On December 26th Professor · Winslow found in reservoir 2, two hundred in the morning and one hundred and fifty in the afternoon. On December 27th he found two hundred in the morning and one hundred and fifty in the afternoon. Very similar results were found in the other reservoir (three hundred and two hundred on December 26th and four hundred and six hundred on December 27th). On December 23d Dr. McLaughlin found at the tap two hundred and forty as against seventy-five on December 17th, and on December 31st, six hundred. There was a heavy rain on December 30th or 31st, and the water again rose very rapidly in the reservoir, reaching its highest point on January 1st and 2d, 1907. On January 6th the number of bacteria at the tap still remained high (five hundred and fifty). In March, 1907, as shown by the Whipple diagram, the water rose rapidly on March 13th and 14th and was high in the reservoir up to March 30th. On March 19th Professor Winslow's analyses show the presence in the morning of one thousand bacteria in reservoir No. 2, and in the afternoon of one thousand two hundred as against seven hundred and six hundred in reservoir No. 3. On March 20th the numbers were seven hundred and eight hundred as against three hundred and nine hundred in reservoir No. 3. I have already said that these analyses showed, in three of the tests, b. coli present in one-tenth of a c.c.

There appears to be one rather marked case in which higher water in the reservoir was not followed by an increase of bacteria at the tap. In July, 1906, there was a considerable rain, and about the 1st of August the water rose in the reservoir in consequence. The bacteria appear to have decreased. But it appears from the diagram that between June 15th and July 31st no less than twelve inches of rain fell. This large amount fell throughout that period in very moderate quantities, but on a good many days. The greatest fall (one and one-fourth inches) occurred

on July 27th. These numerous rains, occurring with much uniformity throughout this entire period, would have 'been, *a priori,* likely to have produced the very result that happened. The earlier rains would have gradually washed off the impurities found upon the surface of the earth, and the latter rains would have gone into the stream comparatively pure. The contention of complainant is not that rain, *per se,* even in considerable quantities, is favorable to an increase of bacteria, but that heavy storms are; storms which wash the earth and carry the impurities that have accumulated upon it in periods of drought, in a concentrated form, into the river. This apparent exception, therefore, would seem to prove the rule.

Mr. Whipple also testifies to certain color tests made in 1904 while the reservoir was unfinished. As far as they go, they lead to the same conclusion that the bacterial counts do, but I do not care to rely upon them, for other causes might have conduced to the results obtained.

I am, on the whole, obliged to conclude that all the evidence favors the theory that water, under certain combinations of circumstances, occurring perhaps on an average two or three times a year, will pass from the mouth of the river to the Jersey City reservoirs in two or three days. Every fact is favorable to this view, and no fact, so far as I can discover, is opposed to it. So strong is the evidence that no expert has been found willing to assert the contrary. Mr. Hering, a gentleman of great experience, would not, as I have already shown, commit himself on the subject, and, what is still more noteworthy, Mr. Cook, the engineer in charge of the works, was not asked to testify about it. Under these circumstances, I accept the opinion of Mr. Kuichling, an expert of wide experience, based as it is upon grounds, that seem to be unanswerable and fortified, as it is, by the other proven facts.

Now this appears to be the difficulty with the defendants' case on this branch of it. The reservoir does its purifying work imperfectly at the time when that work is most needed.

To meet the force of this objection, the water company resorts to proof of averages and to opinion evidence. It uses averages in two ways—*first,* it compares what it calls the *average* efficiency

of the reservoir as a sedimentation basin with the standard pre-scribed by the expert witnesses of the city; *second,* it compares its *average* efficiency with that of filter plants. I may say that in view of the evidence, I regard averages, thus used, as altogether misleading.

The water company's expert, Dr. McLaughlin, says:

"Water which does not contain *b. coli* in one cubic centimeter, judging from my work on this subject, more than fifty per cent. of the times of examination of this particular water of the Rockaway would indicate good, wholesome water, in my opinion."

He says, further, speaking of the result of his tables, in 1904, *b. coli* in one centimeter were present seven per cent. of the time; in 1905, seven per cent. of the time; in 1906, eight per cent. of the time. "I deduce from that that the water is good water."

This method of deducing his conclusion is attacked by the city's experts. They assert that he cannot examine the water once a week for a year and then judge of the excellence of the supply by taking an average of the tests for that year; that the only way in which he can use averages is by applying them to the results of several examinations made of samples taken at the same time from the same place. To illustrate: If fifty samples were taken from the same place on the same day and it were found that *b. coli* were not present in one cubic centimeter in more than fifty per cent. of the samples, then the water would be considered good; but if one sample were taken on one day in each week of the year and it were found that on forty-five days *b. coli* were not present, and on seven days they were, all that that would indicate would be that on forty-five days the water was good, and on seven days it was either bad or, at least, open to suspicion. We certainly would not be justified in concluding that it was good during seven weeks (if a day is to stand for a week) only because it was good for forty-five of the fifty-two weeks which go to make up the year, if, in point of fact, it were found that for those seven weeks it was bad.

Professor Winslow's attention being directed, on cross-exami-nation, to a statement made by him in a discussion published in the journal of the New England Water Works Association to the

effect that the commonly-accepted standard is that water good to drink should not give a positive test for the *coli bacillus* in one cubic centimeter, certainly not over fifty per cent. of the time, said:

"What I meant by that, as I explained a few minutes ago. is that if samples (be) taken from the same source under the same conditions, not more than 50 per cent. should show *b. coli.* When they are taken at different times with varying conditions that conclusion does not apply."

This statement, as applied to the reservoir, seems to me so obvious that nothing but its bare annunciation would seem necessary, and yet the defendants' entire case is built up on the opposite theory. In fact, so strong and positive has been the testimony of defendants' experts on this subject that I should feel hesitation in presuming to differ from them were it not that at least an equal weight of names is on the other side. I think that, perhaps, the witnesses for the company were unconsciously construing the contract in a sense advantageous to that side. They may have assumed that when the contract called for pure and wholesome water it really meant that the general average of the water throughout the entire year should not be below the standard. In other words, that if the fifty-two samples tested, taken on fifty-two different days, were all blended together, and the blend were up to the standard, the contract would be satisfied. If the inhabitants of Jersey City could drink this blend every day, the position would be more plausible.

The company endeavored to demonstrate the efficiency of the reservoir as a purifier in another way. Their witnesses compared the number of bacteria in the water of the river, where it flowed into the reservoir, with the number of bacteria in the water both at the gatehouse and after it reached Jersey City. Dr. Leal, on this basis, for the whole period between June 13th, 1904, and December 10th, 1906, computed the average efficiency at the dam to be ninety-seven and a half per cent. and at the tap in Jersey City to be ninety-nine and two-tenths per cent. He compared this average efficiency with the average efficiency of the Little Falls filter, which he himself superintended. This, he says, was from September 1st, 1903, to September 1st, 1904,

ninety-seven and eight-tenths per cent.; September 1st, 1904, to September 1st, 1905, ninety-six and four-tenths per cent.; September 1st, 1905, to September 1st, 1906, ninety-six and one-tenth per cent. Comparing the two, it would seem that in 1905 and 1906, so far as bacteria were concerned, the reservoir showed a higher percentage of efficiency than the filter. But the question is not whether, on an *average,* the water was good, or whether, on an *average,* it compared favorably with the *average* of some other water, but whether there were times when it was polluted. Such a comparison shows nothing on this head. Dr. Leal is obliged to admit, on cross-examination, that according to Dr. McLaughlin's tables, in June, 1904, the efficiency of the reservoir was only seventy-three per cent. He does not pretend that this was a good showing or that such variations are to be found in the filter plant. And the reason is obvious, if we consider how the work of filtering is accomplished. This is Dr. Leal's description of the process:

"The system of purification at Little Falls is this: As the water enters the filter plant, sulphate of aluminum, from half a grain or a quarter of a grain up to a grain and a half or two grains to a gallon, is added to the water. The sulphate of aluminum on being added to the water splits up into hydrate of aluminum, which is a flocky precipitating mass. It is the same principle as the settling of coffee grounds with white of an egg. This gelatinous matter is spread all through the mass of water and it sinks down to the bottom, carrying with it and tangling in its meshes carrying into it all suspended matter, including bacteria. This process takes place in a large sedimentation basin which holds 1,800,000 gallons of water and the water stays in that about two hours. * * * The free sulphuric acid is left when the hydrate (of aluminum) is split off, unites with the lime base; carbonates of lime and soda (in the water in its natural state). * * * The water flows back and forth in this sedimentation basin and finally flows on to the surface of the (sand) filters. What little is left of the coagulating mass and what few bacteria are left are almost entirely removed on the surface of the filter."

From this description it is evident that the amount of alumina introduced depends upon the condition of the water. It is so regulated, says Dr. Leal, that

"the order to the man in charge is to keep within 100 bacteria. *We don't care so much about the rate of efficiency,* but we want less than 100 bacteria—if it is more than a hundred we add a little more sulphate of aluminum."

This, no doubt, is a perfectly accurate statement of the matter. It agrees with what is testified to by all the experts, but so far from bearing out Dr. Leal's theory of the reservoir as a purification basis, it shows very clearly that the important thing is not so much high percentage of efficiency as it is absolute results. If five hundred bacteria are left in the water, no matter how high the percentage of efficiency, the result obtained is unsatisfactory. "We want less than one hundred bacteria. If it is more than one hundred we add a little more sulphate." Many striking illustrations could be drawn from Dr. McLaughlin's tables. Thus, in March, 1905, the number of bacteria per c.c. is, in the river, nine thousand one hundred. The number at the gatehouse is six hundred. The percentage of efficiency, calculated according to the method employed by Dr. McLaughlin (*p. 3221 of printed case*) is ninety-three per cent. I use the gatehouse figures because the reservoir as a purifier is compared with the filter plant as a purifier. In the case of this latter, the figures relate to the water as it passes out of the filter, not to the water as it is delivered to Bayonne or other suburban towns. In December of the same year the number of bacteria in the river was seven thousand two hundred; the number at the gatehouse, one thousand; the percentage of efficiency, therefore, sixty-three per cent. In January, 1906, the number of bacteria in the river, one thousand five hundred; at the gatehouse, nine hundred; the percentage of efficiency, forty per cent. If this mode of computing the efficiency could be relied upon it would condemn the reservoir, regarded as a purification agency, as inefficient and almost useless. The fact is, however, that it is entitled to no such condemnation. The method adopted appears to be absolutely worthless for the following reason: What Dr. McLaughlin did was to take samples of water out of the river and out of the reservoir at the gatehouse, and at the tap in Jersey City on the same day, and each sample was taken at about the same, or nearly the same, time on that day. Now, according to all the evidence, it must, except under such extraordinary conditions as the water company would not be obliged to provide against, for instance, an unprecedented drought lasting so long that all the water in the reservoir was exhausted, followed by an unprecedented

11

freshet, it must, I say, take a day or, more likely, two or three days, for the water to pass from the mouth of the river to the gatehouse, and it takes just seventeen hours for the water to travel from the gatehouse to Jersey City. To take, therefore, figures showing the bacteria in the water at these three different places, at the same time, is not the slightest evidence of reservoir efficiency. To find out the efficiency, we must know how the water flowing into the reservoir has been affected by its passage through the reservoir. .This, of course, we cannot know absolutely for the reasons heretofore adverted to, and, besides, the water of the river would, under any circumstances, be diluted with the water already in the reservoir. But if we had had a daily test at the gatehouse and at Jersey City it could, I think, have been approximated.

Another illustration is a *reductio ad absurdum* of the method employed. On January 12th, 1905, the bacteria in the river per c.c. amounted to two thousand seven hundred, the bacteria at the gatehouse, five thousand four hundred. If we could draw any inference it would be that the reservoir had increased the pollution. When Dr. McLaughlin's attention was called to this he suggested that in the long run the figures given would correct themselves. I doubt if we have enough instances, even for this purpose, but the fundamental difficulty would remain: we would still have *average* efficiency and not the efficiency of the reservoir in times of freshet or drought, followed by heavy downpour. It is very easy to see that by taking averages, very good water—water above the standard—delivered at one time may be used to cover up the faults of polluted water delivered at another time.

There is another and, as it seems to me, important observation to be made with respect to the table showing the efficiency of the filter plant. This table shows *monthly* averages only, although daily tests were made at the filter works. And this table deals only with bacteria and not with *b. coli.* It is hardly possible that the East Jersey Water Company made no analyses for *b. coli,* and yet these are not shown with a view of comparing them with the analyses for *b. coli* made by Dr. McLaughlin. However, taking the table as we find it, it appears that the

greatest number of bacteria present in the filtered water in any month is three hundred, as the average for February, 1906. On only two other occasions did the bacteria rise above two hundred. In far the larger number of cases it was much below one hundred. It is not likely, in view of Dr. Leal's statement about adding aluminum that these averages were much exceeded on the several days of those several months. The showing thus made is a far better one than is afforded by Dr. McLaughlin's monthly showings of the water at the gatehouse. On January 12th, of the year 1905, there were five thousand four hundred bacteria per c.c. On three days of three other months in the same year, one thousand, or more. In the three years covered by his monthly report, once they numbered nine hundred, once seven hundred and fifty, six times they ranged between five hundred and seven hundred and only four times did they fall below one hundred.

So much for Dr. McLaughlin's results at the gatehouse. Let us look at his results at the hospital. It must be remembered that, owing to a lack of other data, we are obliged to compare the bacteria found at the hospital with those found at the exit of the filter. To make a fair comparison we should compare the water at the tap in Jersey City with the filtered water at the tap—say in Bayonne. If the water is additionally purified by passing through pipes, as it appears to be, then the filtered water at Bayonne would make a better showing than the same water at Little Falls. Here, too, Dr. McLaughlin gives us an average and this average, from June, 1904, to December, 1906 (inclusive), is one hundred and seventy-five bacteria. This is more than Dr. Leal thinks ought to be allowed to pass through the filter. But when we come to analyze Dr. McLaughlin's figures for individual days we find this: that in 1894, out of forty-five tests, the bacterial count was, on twenty-two occasions, three hundred or over. On ten occasions, six hundred, or over; once, one thousand; once, one thousand seven hundred, and once, three thousand seven hundred. In this year, however, as I have already said, the reservoir was still under construction. In 1905, there were forty-one tests. The result was that on twelve occasions the bacteria amounted to, or exceeded, three hundred;

on one occasion they amounted to seven hundred and fifty, and on two occasions, to one thousand three hundred. In 1906, in fifty-one tests there were only fifteen occasions when the count exceeded one hundred; four when it exceeded two hundred; once it was three hundred and twenty-five; once, three hundred and seventy-five, and once, four hundred, to which we ought to add Professor Winslow's one hundred and fifty, two hundred and three hundred on December 26th in the Jersey City reservoir; two hundred, four hundred, six hundred and six hundred and fifty on December 27th; six hundred, seven hundred, one thousand, one thousand two hundred on March 19th, 1907; five hundred, seven hundred, eight hundred, nine hundred on March 20th, 1907. From such a small number of data in 1907 we should scarcely be warranted in drawing any conclusion, except this: either that conditions were unusually favorable in 1906 or that the water at the tap was better than the water as it was delivered into the small reservoirs, for Professor Winslow's results show that for two days in March, 1907, the water contained considerably more bacteria than it had contained at any time in 1906.

The general result is that, taking the best year, in seventeen instances (counting Professor Winslow's eight analyses as only two because made on only two days) the number of bacteria exceeded at the tap what Dr. Leal thought was not a satisfactory number even at the exit of the filter.

The bacteria do not necessarily come from the intestine of either man or beast. The *b. coli* do. I do not find any table that indicates the number of *b. coli* present after the water has been filtered. We will, therefore, have to judge of these by a different rule. I do not understand that the water company's experts quarrel with the rule stated by Mr. Whipple. That rule is this:

"If the water regularly shows the presence of *b. coli* in ten cubic centimeters and not in one cubic centimeter it may be safe for use. If it contains *b. coli* in one cubic centimeter and not in one-tenth cubic centimeter it may be considered as of doubtful quality. If it contains *b. coli* in one-tenth, but not in one-hundredth cubic centimeter it may be considered to be too much polluted to be safely used. If it contains *b. coli* in one-hundredth cubic centimeter the water is quite certain to be seriously polluted."

Now, testing the water by this rule, we have the following results derived from Dr. McLaughlin's tables. In 1904, on three occasions, *b. coli* were found at the Christ Hospital tap both in one c.c. and in ten c.c. and on eight occasions in ten c.c. In 1905, *b. coli* were found twice, both in one c.c. and in ten c.c., and twenty-four times in ten c.c. In 1906, *b. coli* were found four times both in one c.c. and in ten c.c. and thirty-two times in ten c.c. This result is rather noteworthy. It shows that while the number of bacteria was smaller in 1906 than it was in 1904 the number of *b. coli* was greater, on the whole, in 1905 than it was in 1904, and greater in 1906 than it was in 1905. *B. coli,* as I understand the evidence, are more indicative of undesirable pollution than are bacteria.

The conclusion from this evidence would be that, applying the Whipple rule in 1904, the water was of doubtful quality seven per cent. of the time; in 1905, five per cent. of the time, and 1906, eight per cent. This, in days, would be, in 1904, twenty-five and a half days; in 1905, eighteen days, and in 1906, twenty-nine days, or, if we include Professor Winslow's analysis, thirty-one days.

I now come to the opinion evidence, and, first, the evidence of Dr. Johnson. He and Dr. McLaughlin made, independently, analyses of the water at the tap in Christ Hospital on March 28th and 29th, 1907. His tests showed the presence in one cubic centimeter of bacteria whose numbers in the different tests varied from two hundred and forty and three hundred in one c.c. to two hundred and twenty in one-half of one c.c.

It is rather singular that he is not called upon to say whether he regards this number as satisfactory, but he is referred to Mr. Whipple's rule and says that Dr. McLaughlin's results show water within Mr. Whipple's standard. He, too, evidently has in mind *averages,* for he could not assert that according to Mr. Whipple's rule, as Mr. Whipple himself interprets it, water is good which contains *b. coli* in one c.c.

Then he is asked to compare the *average* efficiency of the Boonton reservoir with the average efficiency of the filter plants at Little Falls, Washington, Albany, &c., and he says it compares very favorably with the results obtained in those works.

Here, again, we have the same fallacy. What we want to know is, not about the averages, but whether the reservoir can be depended upon, in all seasons of the year, to provide pure and wholesome water. If the filter works uniformly furnish such water and the reservoir does not, then even though the reservoir may for the greater part of the time give better results than the filter, if at some time it gives unsatisfactory results, then it is not as efficient or as safe a purifying agency as the filter is. Dr. Johnson gives his evidence lucidly and carefully, and I fail to find in any statement that he makes anything at variance with what is said by defendants' experts. Thus he is asked to express his opinion whether it would ever be possible for an epidemic of typhoid fever, due to the water-supply, to break out in Jersey City, and this is his answer:

"If there is a complete or even approximately complete displacement of the water in the Boonton reservoir and no direct current from the Rockaway river to the outlet of the Boonton dam, I think it is extremely improbable that an epidemic would ever occur in Jersey City due to the water-supply from the Boonton reservoir."

Every witness in the cause admits that if the water in the reservoir stays there long enough it will become purified. Dr. Johnson's evidence presupposes that it does. He expressly says that the river water is unfit to drink. He gives some figures in reference to the three reservoirs which supply Washington, District of Columbia. The water passes successively through all of them and is then filtered. He says that the period of storage in the first two is from one to two days each and in the third from two to four days. In the first the percentage of removal is seventy per cent. In the first and second together, eighty-six per cent. In all three, in a period of from four to eight days, ninety-three per cent. Then he is asked the question: Are any of these places (Washington, Lawrence, &c.) comparable with that of Boonton for efficiency of storage? and his answer is: "No, sir." Here, too, he assumes, for he necessarily must assume, that it takes longer than eight days for the water to pass from the river to the dam, for if it did not, then, on his own figures, assuming that the river water was not much diluted, the efficiency would be, or might be,

only ninety-three per cent., and no one pretends that this would indicate satisfactory work. Finally, counsel asks this question:

"Now, Mr. Johnson, what have you to say as to the result showing an *average* at the tap of bacteria to be only 239 per c.c., what have you to say as to the *quality* of that?"

He replies: "I consider it a very good result."

Here, again, we have averages. If his attention had been directed to the results obtained by Professor Winslow in March, 1907, in the Jersey City reservoirs, viz., one thousand and one thousand two hundred bacteria and *b. coli* present in one cubic centimeter in one sample and one-tenth of one cubic centimeter in another, the whole trend of his evidence shows that he would have expressed, as to that water, a different opinion.

Then we have the testimony of Mr. Hering. He says that the results of Dr. McLaughlin's reports show that the quality of the water as *now* (that is, at the time he testified) delivered to Jersey City is of good quality, safe and potable. This is a stronger statement than Dr. Johnson's. Unfortunately, he does not state the reasons upon which this opinion is based. As he does not quarrel with the figures given by the other witnesses as to the length of time during which sedimentation must continue in order to eliminate pollution, I suppose that his opinion is founded upon the assumption that the water has time to purify itself. He subsequently stated, as I have already said, that he would not undertake to say how many days it would take the water, under freshet conditions, to flow across the reservoir.

Mr. Edloe Harrison also testifies on this subject. His testimony is based upon the results of Dr. McLaughlin's analyses. He says: "The fact is that this reservoir is reducing the bacteria to as great an extent as the most improved modern filters." He must, of course, be referring to averages. He thinks that a reservoir which works automatically is superior to a filter plant because filtration depends upon human agency, and, if the work be not intelligently performed, the water will run through without being adequately purified. He says that in his reading he has not met with an instance in which infection has taken place from a large storage reservoir, and that the published reports as

to other cities show the water coming from the Boonton reservoir to be better than that of other cities. Undoubtedly it is much better than the water of a large number of the cities of this country. The argument would be stronger if it were not for the fact that it appears very clearly that the water of these cities is polluted, and that where cities having a polluted water-supply have adopted precautions the death rate has been greatly reduced. In the case in hand Jersey City bargained, not for water less polluted than that of some other cities, but for pure and wholesome water. There is considerable force in the suggestion that a system which works automatically is better than one which depends upon human agency, but this, of course, presupposes that the automatic system is doing effective work. If it is not, then it must be *supplemented* by human agencies. The very point is whether the automatic system here under examination is producing uniformly good results, or whether, to ensure them, sedimentation must not be supplemented by something else. But to this phase of the controversy Mr. Harrison's attention was not particularly directed. Professor Sedgwick says that the serious objection to a reservoir such as the Boonton reservoir, as compared with a filter, is that if it works badly, as he believes this one does from time to time, there is nothing that can be done easily, or conveniently, or quickly, to remedy the trouble, whereas in a filter, rightly supervised, changes can be made to correct any defects which may be discovered. He considers a reservoir like the Boonton far inferior as a sanitary safeguard or purifying mechanism to a filter.

Referring to Mr. Harrison's evidence, Mr. Kuichling says:

"I do not believe that Mr. Harrison's statement is correct for the reason that he does not consider the possibility of a freshet or a high wind or the action of the reservoir when covered with ice, in times of freshet. He also ignores entirely the demonstration of the existence of persistent and marked currents in the reservoir as shown by the float experiments, and also by the number of bacteria in the river and at the upper gate-house, and at the tap in Jersey City. He also stated that he knew of no case of typhoid fever produced by the use of water from a larger storage reservoir, whereas we have the fact that there was at Scranton, Pa., a very serious epidemic of typhoid fever last December and January from the use of infected water from a very large storage reservoir."

Dr. Herold, the president of the Newark board of health, also testified on the behalf of the water company. He is asked a hypothetical question, based upon the capacity of the river and of the reservoir, and expresses the opinion that he regards the works as affording a safe method of purification. He says that Dr. McLaughlin's report shows the water to be of good quality and the water-supply safe. But on cross-examination it is evident that he thinks there must be time for sedimentation. He says it would be better if the water were given one hundred days to settle, but that the minimum limit would be fifteen or twenty days, time enough, as he says, for the destruction of pathogenic germs. These, he thinks, would die in that period. He is not a bacteriologist, and if he thinks that pathogenic germs will perish in twenty days, he disagrees with the bacteriologists on both sides. If pathogenic germs were not present he thinks perhaps the water could be used in twenty-four hours. His testimony rests upon the assumption that the water does not pass from the river to the gatehouse in less than fifteen or twenty days.

Dr. Leal expresses the opinion that the water delivered to Jersey City is pure and wholesome, because, in addition to the argument from averages, it appears that the death rate shows that during the past three years there has been no infection, and so does Dr. McLaughlin. The argument from the death rate seems to me to be the strongest that the water-supply company advances. But inasmuch as there has been no epidemic of water-borne diseases in the watershed, and few cases of typhoid fever—one of the two testified to, at a distance from the river, and the other properly cared for—the argument derived from an absence of epidemic in Jersey City is somewhat weakened. The reservoir as a safe instrumentality of purification has not been put to the test. Indeed, one of the controverted questions in the case is whether an apparently slight increase in the death rate in 1906 is not attributable, at least, to one of those cases, they being nearly coincident in point of time.

There is nothing in Mr. Sherrerd's evidence that throws additional light upon the controverted points. He merely says,

what no one denies, that long time storage tends to improve the quality of the water and is an effective way of improving it.

He also says that some tables prepared by Dr. McLaughlin, which he had seen, but which are not identified, indicate a low bacterial count and show a water of uniform quality with, as a rule, less than one hundred bacteria per c.c. What the tables produced in evidence show has already been considered. Such of his evidence as is based upon tables, if any, not put in evidence, cannot be regarded as satisfactory proof.

I now come to the testimony given on behalf of complainants. Mr. Whipple says that his tests show that the water as delivered to Jersey City is, to some extent, contaminated, but in a lesser degree than it is in the river; that judging from all he knows of the situation, it is not at all times pure and wholesome. Of all the experts in the case, with the exception of Dr. Leal, Mr. Whipple made the most exhaustive examination of the conditions surrounding the supply. He visited all parts of the watershed and advised as to the abatement of many of the sources of pollution.

Professor Winslow is another witness. He says:

"From my analyses (made in December, 1906, and March, 1907) of the water entering the reservoirs at Jersey City (the two small ones on Jersey City Heights), from my knowledge of the watershed of the Rockaway river, and from my previous experience in water analyses and in the study of watersheds, I conclude that the water at the inlet of the reservoirs (i. e., in Jersey City) at the time at which I examined it varied considerably in quality; that at times it showed no evidence of pollution, but that at other times it showed distinct and conclusive evidence of pollution. At certain of those times it was not pure and wholesome * * * free from pollution deleterious for drinking and domestic purposes. I base that opinion first, on the presence of an excessive number of bacteria on gelatine, which probably indicates the presence of sewage pollution, and second, on the presence of large numbers of colon bacilli, which, in my judgment and under the circumstances, indicated with certainty the presence of excreta in the water. * * * In my examination I found, for example, in the afternoon of December 26th that there were less than 200 bacteria per cubic centimeter, and I got b. coli from neither reservoir at one cubic centimeter, and I believe that the water at that moment was of good quality. But on the morning of March 20th I got more bacteria and I found b. coli in both reservoirs in one-tenth of a cubic centimeter, which was conclusive evidence to my mind that at that time there was pollution in the water."

This evidence strongly illustrates the danger of resorting to averages. Neither Dr. Leal nor Dr. McLaughlin nor Dr. Johnson would pretend, assuming Professor Winslow's analyses to have been accurately made—and there is absolutely no attack made either upon his methods or his competency—that those of his analyses which showed seven hundred bacteria (in other instances one thousand and one thousand two hundred) and *b. coli* present in one-tenth of a cubic centimeter indicated water of good quality. Hence, the necessity of taking refuge in averages.

Professor Sedgwick made no analyses himself. His attention was directed to those of Dr. McLaughlin. He is asked to express his opinion upon their result. He says:

"I don't feel competent from these alone to give a positive opinion as to the quality of the water at all times and in all seasons, because I do not think there are enough of them; but so far as they go, they show that a good deal of the time the water was in fair sanitary condition. The number of bacteria at large are frequently larger than is desirable in a good water-supply and the occasional occurrence of *bacillus coli* in one cubic centimeter is to be regarded as throwing suspicion on the water. But to return to what I said at the beginning of my answer, I do not feel that these are either frequent enough or numerous enough to enable one to speak with certainty as to the good quality of the water and as far as they seem to me rather to throw suspicion on the quality of the water."

This is his inference drawn from the McLaughlin analyses alone. Then he goes on to say that he would rely upon four things in order to determine the quality of water—

*First,* upon the state of the watershed, in order to see whether the water is or is not contaminated; *second,* upon a consideration of any means of purification, partial or complete, to which it may be subjected before reaching the consumer; *third,* upon its sanitary effect upon the people using it; *fourth,* upon analytical data. "I believe that an opinion as to the quality of the water ought to be founded upon all these data taken together." He then states that he considers the water as it flows into the Boonton reservoir to be at times highly impure and unwholesome. After testifying that he had seen and examined the Whipple report as well as the McLaughlin and Winslow analyses, he is asked this question:

"*Q.* From all those data and from your own knowledge of the watershed and from the typhoid records, what do you say as to the water as delivered at that point (the aqueduct at Jersey City) being at all times pure and wholesome?

"*A.* Taking into account my knowledge of conditions on the watershed of the Boonton reservoir and of the analytical results obtained at various points on the system and in Jersey City, as well as the records of deaths from typhoid fever, I believe that the water as delivered into the reservoirs at Jersey City is not at all times pure and wholesome, but sometimes deleterious for drinking and domestic purposes."

After stating that he has studied the subject of sedimentation and of the efficiency of the Boonton reservoir as a sedimentation basis, he says:

"Taking into consideration the contours of the reservoir bottom, as shown on the map of Mr. Ferris (the city engineer), and also taking into consideration the float experiments, the distance from the mouth of the Rockaway river to the outlet, and my general knowledge of the behavior of water in reservoirs, I have no doubt that at times impure water may be carried from the mouth of the Rockaway river, where it empties into the Boonton reservoir, to the reservoir in Jersey City."

Mr. Kuichling is another expert witness. He says he does not regard the Boonton reservoir as a reliable and efficient purifying mechanism; that its efficiency will be greatly reduced in times of freshet, accompanied by winds, tending to accelerate the motion of the water from the mouth of the river toward the dam and gatehouse; that it will be less efficient when fifty millions of gallons are drawn out than it is now when thirty-five or thirty-six millions are being drawn, and that in times of drought and consequent low water followed by freshet its efficiency would be at its minimum.

Such is the evidence of the principal witnesses on the question whether the contractor has complied with his contract obligation to so construct the works that "they shall be delivered to Jersey City as a completed operating plant, free from pollution," and "so prepared as to prevent all contamination from any source" of "the pure and wholesome water" to be furnished. I think the weight of the evidence is that while much has been done toward securing the end in view, the works are not yet "so prepared as to prevent all contamination from any source."

What, then, is the position of Jersey City? Notwithstanding its contention on this branch of the case, it asks a specific performance of the contract. While its allegation is that "the defendants cannot convey and deliver to your orator a completed operating plant free from pollution because polluted matter passes into the water-supply from the following places—from the Hibernian mines; *e.* from the Hibernian village; *j.* from the town of Dover," and that "no intercepting sewer has been built at Boonton and no sewage disposal plant has been built at Dover," yet the relief that it prays is, that defendants may be decreed to convey, on payment of such part of the consideration contracted for, as this court may ascertain to be due. It is quite within the power of the court to decree performance with an abatement in the price for that part of the thing bargained for which the vendor is unable to convey, and so its prayer is not inconsistent with its allegations.

The purification of the water could be effected by means of a filter plant. To construct it and to convey the filtered water to Jersey City, at the head contracted for, would involve great expense. It would have been so important a part of the scheme that had it been contemplated, it would, naturally, have been mentioned in the agreement. The bill does not pray for any deduction grounded upon its absence. It may, therefore, be dismissed from consideration unless the evidence shows that it is indispensably necessary to a complete performance of defendants' contract obligation. I do not think it does. Some of the pollution complained of has been stopped. A very considerable improvement in the case of the Lyondale Print Works and of Mount Tabor has taken place. Conditions have been improved at Dover and Hibernia and in the factories on the Cooper-Lord estate at Boonton. The position of these factories in the gorge, at and below the falls of the Rockaway, is unfortunate, but the city contracted in full view of the situation and is not in a position to complain of it. It is a situation that will call for constant vigilance in the future.

### *Dover.*

Dover and Hibernia seem to present the greatest difficulties. There is this provision in the contract:

"*Eighth*—It is further understood and agreed that all sewers and sewage disposal works constructed or arranged for by the contractor to *prevent* pollution or to carry off pollution existing in the watershed shall, under said specification and plans, be so constructed and arranged for by him that in the event of the purchase of the water-supply and plant by Jersey City under any of the options aforesaid, the operation and maintenance of such sewers and sewage disposal works for the purposes aforesaid shall not be a charge upon or expense to Jersey City."

This clause is so worded that there is no express agreement to build sewage disposal works, but under the provisions of the first paragraph, which provide that the contractor shall so construct and maintain the works that the water delivered therefrom shall be pure and wholesome and that if such works and supply are purchased they shall be delivered to the city "as a completed operating plant free from pollution as aforesaid," I think it is clear that the company must construct disposal works if they are necessary to insure the purity of the water-supply. It cannot be said of them, as it can be of a filter plant, that they were not within the contemplation of the parties. They are expressly mentioned in the contract itself as works that may have to be built.

There can be no doubt, under the evidence, that it was represented to officials of the city that such works would be constructed. Mr. Ringle, one of the board of finance, says that during the progress of the negotiations he and other members of the board of finance and of the board of street and water commissioners went to Dover on a tour of inspection, and that they were informed by Flynn's agent that if the contract was awarded to him they were going to build sewers and sewage disposal works at Dover. Mr. Hoos, then mayor of the city, testifies to the same effect. Mr. Midlige, a member of the bar and, at that time, a member of the board of finance, says that he stated to Mr. Edwards, Flynn's counsel, and to Mr. Connelly

that under no circumstances would he, as a member of the board, vote for a contract that did not provide in an absolutely complete measure for the pollution that would arise in the towns of Dover and Powerville and through that section of country from which the supply would be taken, and that Mr. Edwards and Mr. Connelly both stated that a sewage disposal works was to be constructed and cared for by the towns that lay within its territory. Mr. Nolan says that on one of his tours, as a member of the street and water board, he was told that "there would be a disposal works at Dover carried on a level plain outside of Dover, and the solids to be used for manure and the liquid to be run into the river clear and pure." While these extracts from the evidence show that no definite plan had then been agreed upon or even matured, they, at least, indicate that disposal works of some sort were promised. The evidence, of course, does not extend the contract obligation, but it certainly shows that the clause was inserted after due consideration and at a time when the contractor himself thought that the works would have to be built.

Many witnesses were called on both sides to show the condition of affairs in Dover. While the trial was progressing the diligence of the city's witnesses led to the discovery of several cesspools and polluted drains which discharged their contents into the river. Where the proof was clear, the evil was corrected by the agents of the water company. Much of the evidence has, for this reason, become unimportant, except in so far as it shows the extreme difficulty of adequately protecting the river as it flows through Dover under existing conditions. There are no sewers there. Each house is provided with a cesspool. Many of these cesspools are built up with boulder stones, uncemented. Their contents leach into the surrounding soil which is, in large part, a low, gravelly plain, characterized by Mr. Jenkins as glacial and easily permeable with water. The gravel goes down to a depth of ten feet or more until it strikes a hard pan "made up very thickly with gravel and boulders." In this gravel the water rises and falls as the river rises and falls. Mr. Sickley, a contractor, says he has noticed this rise and fall seven hundred feet from the river. He says, moreover, that the cesspools that

he built clean themselves. Some of the land is flooded in times of freshet. There are drains in different parts of the town, generally covered, which occupy the site of ancient brooks and still receive some of their waters.

Now, one of the controverted questions in the cause is as to the extent to which, and under what circumstances, water is purified by flowing through soil. It is agreed that sand is a better purifier than coarse gravel. In a situation such as exists at Dover, Professor Winslow says it would be a miracle if some of the fecal matter did not reach the river. In the case of a much closer-grained soil than in Dover, Mr. Kuichling says that the New York state board of health requires cesspools to be maintained at a distance of at least fifty feet from the stream. In this soil he thinks they should not be permitted at less than a distance of one hundred feet. He says there are a number of cases on record where the public water-supply has caused an epidemic of typhoid due to infected matter passing through permeable soil. Professor Sedgwick says that fifty feet is the distance demanded by the state board of health of Massachusetts in the case of all streams which there contribute to a water-supply. Many cesspools in Dover are less than this distance from the stream. Considering the situation, I should say that with the exercise of even unusual vigilance it would be practically impossible to keep all the sewage of Dover out of the river. Not only will it percolate through the coarse gravel or be carried to the river over low-lying land in times of flood, but there will be a constant temptation to get rid of it by means of secret drain connections. If proof of this were needed it would be found in the testimony already alluded to relating to the discovery of pipes connecting cesspools with the river or with drains leading into it, and this, after Dr. Leal had been exerting all his vigilance to stop it, for several years. The report of Mr. Whipple shows that in the water above Dover he found an average of one thousand eight hundred and twenty-five bacteria, while in the water below he found an average of twenty-nine thousand six hundred and fourteen. Of course, much of this may have been street wash.

The construction of a disposal works would require the co-operation of the municipality of Dover. Neither the water company nor Jersey City itself would have the right to enter upon its streets and lay pipes therein. Much less would they have authority to compel the householders to connect their closets and cesspools with those pipes. But it does not appear that the water company has sought the co-operation of Dover in this matter. On the contrary, their position now is that such work is not necessary. I am unable to concur in this view, unless such works would do more harm than good.

This brings me to defendants' next contention. They say that to concentrate the sewage of Dover and to discharge it into the river at a single point, only partially purified, would result in a greater amount of pollution than now exists. Their position is this: As matters now stand, each house has its own cesspool. The fluid matters which find their way out of the cesspool are quickly purified by the natural soil acting as a filter. Very little, either by occasional surface inundation in times of freshet or by percolation, finds its way into the river. If any water coming from the cesspools reaches the stream it has become purified on its passage thither. Consequently the pollution, if any, thereby resulting is less than that would result from the discharge of partly purified water coming from sewage disposal works.

Dr. Johnson, on behalf of the company, thus testifies on this subject:

"*Q.* In your opinion would the building of sewers in unsewered towns such as Dover, in such a watershed, effectually prevent pollution or infection of the water?

"*A.* That would depend on the point of discharge.

"*Q.* Supposing they discharged above the reservoir?

"*A.* Then it would most certainly not prevent pollution. On the other hand, it would increase the danger, because of the concentration of the polluting matter at one point."

It will be noticed that Dr. Johnson is asked only whether the present system would not be preferable to one which would cast the entire sewage of Dover, unpurified, into the stream below the town. There could be but one answer to such a question. It is significant that counsel for the company did not see fit to

ask this witness as to the effect of a sewage disposal works, although he was an expert on the subject.

Dr. Leal expresses an opinion upon the very question in the following words:

"In my opinion there would be more danger of infection of the water-supply with the sewage system and purification plant than under present conditions, for this reason: There is a certain amount—I believe the principal pollution to-day of the Rockaway river comes from the streets of towns, country roads and manured fields. * * * You are going to have that just the same if you have your sewage system because no sane man to-day would put in the combined system. * * *

"To the best of my knowledge and belief to-day there is no direct foecal pollution of the river; that is, I don't believe there is any pipe carrying foecal matter, or I don't believe any foecal matter gets into the Rockaway river unless somebody uses the banks, which cannot be prevented; and the only possible foecal matter which can get into the river to-day is either through percolation or through flowing over the ground. Now that is a very small proportion of the total foecal sewage of Dover—a very small proportion. * * * Now you are going to bring in all this matter altogether to one point, that is, you are going to connect houses which cannot pollute the river or its tributaries, bring their sewage right to one point, and you are going to keep it all there. You are going to purify it. Well, if you purify it up to 95 per cent. you are doing pretty well and you will be lucky to get that. It will be nearer ninety. That means that there is ten per cent. that goes into the river. Now I believe that ten per cent. is a great deal more than goes into the river to-day. I don't believe that there is one or a half per cent. that goes into the river to-day."

Now, this is a very strong presentation of the case. If the premises were well founded it would be difficult to resist Dr. Leal's conclusion. I am inclined to think that Dr. Leal takes too favorable a view of the conditions prevailing in Dover. He overlooks, or rather does not give sufficient weight to the consideration that people sometimes neglect to empty their cesspools when full; that they dump their contents in places where they ought not to; that freshets may occur in this low valley, which will overflow the cesspools in parts of the town; that the soil being a coarse gravel is easily permeable by water; that there will be a constant temptation to connect, secretly, the closets and cesspools with the covered drains that carry off the surface water, and that even with vigilant outside supervision, the agents of Jersey City will not be allowed to enter private

dwellings and other buildings merely with a view to secure evidence. In theory, resort may be had to the injunction process of this court. In practice, this resort would, perhaps, be ineffective, because of the difficulty and delay in obtaining proof such as the court could act upon.

Dr. Herold in a qualified way agrees with Dr. Leal. He says, *with a properly supervised system,* privies would be less likely to pollute the water-supply than a disposal works. He says, however, that sewage disposal works are satisfactory where the soil is proper, and that the percentage of purification *ordinarily* obtained by these works is not over ninety per cent. Then he indicates what he means by a properly supervised system:

"I mean that it must be policed and there must be some one to go over the shed at all times and see that there are no privy vaults that are flowing—no cesspools that are overflowing—and the condition of the property on the banks of the river must be kept free of polluting organic material."

If Dover itself were being supplied with the water for drinking purposes and its citizens, therefore, interested in having their supply pure, it is easy to suppose that effective ordinances would be passed to regulate the use of cesspools, drains and sewers, and that its police and health agents would be vigilant in enforcing them, and that they would have the good will of the entire community in doing so. This, I imagine, is the sort of supervision that Dr. Herold would think necessary. It can hardly be supposed that the agents of a distant municipality, particularly if they should perform their duties with any degree of vigor, would stand on a similar vantage ground. Friction and even hostility would be the natural results of any attempted interference by one municipality with the internal arrangements of another. "A properly supervised *system,*" to use Dr. Herold's words, could hardly be expected.

On the other hand, the complainants' experts say that within a very few years sewer pollution works have been so far perfected that the polluted water passing through them is or may be so completely purified that it can even be drunk with impunity. Professor Winslow says:

"Practice in sewage disposal has reached such a stage in the last few years that we can obtain any result that we choose. If it is desired to produce an effluent organically pure, but not purified from bacteria, that can be done chiefly. If, on the other hand, it is designed to produce an effluent of such a quality that it can be turned into a drinking water-supply with impunity that can also be done."

Professor Sedgwick testifies that he observed some evidences of attention to privies but no arrangements for cemeted ones *carefully emptied by those in charge of the water-supply,* such as are found on the Metropolitan water-supply of Boston, nor any placards forbidding the pollution of the stream. He says further:

"I did not observe any sewage disposal plant, such as in my judgment ought to exist in the city of Dover, if the water of the Rockaway river is to be used as a source of supply for the Boonton reservoir.  *  *  * I believe that the sewage disposal plant is vastly preferable ('to the situation as it there is') and that it would be a much safer arrangement."

Mr. Kuichling says that it is possible to prevent substantially the Dover contamination from entering the Rockaway, and he estimates the cost of a sewage disposal works at $105,000.

Taking into account all this testimony, it seems to resolve itself into a matter of expense. The purification effected by the disposal works to which Dr. Leal referred was, no doubt, partial. There is nothing in the case to throw doubt upon the evidence of Professor Winslow to the effect that if the proper methods be adopted the water can be purified to such an extent as to render the effluent harmless. Naturally, the company does not wish to incur this expense, but if it be necessary, in order to conform to the terms of their contract to furnish pure and wholesome water, the matter of expense is, from a legal standpoint, irrelevant. I think that the weight of the evidence is that the river, as it passes through Dover, is very considerably polluted; that freshets may increase the danger and that a properly constructed disposal works, properly managed, would be a considerable safeguard. It is no answer to this to assert that the works might be carelessly managed and that the risk of pollution would then be greater. If it can be assumed that in a matter so .vital to the health of the city there would be mismanagement of the works,

the same assumption would have to be made in reference to the supervision of Dover by Jersey City officials under present conditions. Such an assumption would be fatal to Dr. Leal's contention, for he admits that the situation, as it is to-day, is one requiring ceaseless vigilance. Only because of that vigilance, which he says is now being exercised by himself and his subordinates, is the water-supply, in his estimation, safe. Assuming that the same degree of vigilance would be exercised by the city with reference to its disposal works that is now being exercised by the water company, whose management is itself the subject of criticism by Professor Sedgwick in the extract from his testimony that I have before quoted, then I think the weight of the evidence shows that disposal works would afford added protection. If I had thought that the evidence did not support that view, I should have been forced to the conclusion that a filter plant should be provided in order to satisfy the paramount contract obligation to furnish pure and wholesome water.

### *Hibernia.*

I now come to Hibernia. Here, too, I think conditions are unsatisfactory. The hamlet is thus described by Mr. Kuichling:

"The village or settlement of Hibernia is essentially a mining camp. It contains numerous small houses occupied by the miners, and there are about twelve hundred to fifteen hundred people there. Of that number, from one thousand to twelve hundred work under ground in the mines during the day. While they are under ground their wastes mingle with the mine drainage water which is pumped to the surface and flows into the brook that runs through this little settlement or village. This village is in a narrow valley with steep hillsides. These houses are not of a high class of construction. They have, many of them, privies adjacent to runways for water—what would be called a water-course or depression in the ground not containing running water. Some are only running brooks and rivulets. Pig-pens and hen-coops and stable yards, generally, are located so that the drainage flows off readily. The water in the Hibernia brook is discolored and visibly and palpably polluted, both from what surface water there is as well as from the mine drainage. One of the mines delivers water that is as discolored and opaque as almost any city sewage. From another, the water comes out clear. In this latter case the water is used for condensing the steam of the mine engine—the hoisting engine at the surface. In the other case it cannot

be so used because it is too dirty for that purpose. I am informed by
the superintendent at the time, access to the same having been refused,
that there are no sanitary conveniences for the miners under ground."

The brook here spoken of flows into Beaver brook which flows
into the river just below Rockaway village, at a point about eight
miles above the reservoir, if measured along the stream, or about
four miles and a half in an air line.

The description of the village as above given is not contro-
verted. The defendants called Mr. Munson, the mine superin-
tendent. He admits that there is a moderate descent from all
the houses toward the brook. Of the surface, he says, "it is a
rather rocky surface; very rocky surface, in fact." The privy
vaults are formed by digging down in the soil which, in the
valley, is loose stone. He says that at the suggestion of Dr.
Leal and Dr. Herold and by direction of the mine owners he
took down an old mining house, and that where the vaults were
filled, or nearly so, they dug new ones, built of loose stone, un-
cemented; that as to the mines themselves, the men use as a
substitute for privies old abandoned levels, and that if the men
are known to go elsewhere they are discharged. He also says
the men drink the mine water and that he has never known of
a case of typhoid fever there. Commenting on the condition
of affairs, Dr. Leal says that the superintendent described the
conditions exactly; that he would only state that there is no
direct contamination of the brook; that where the privies were
too near they were moved back (he does not say how far), and
that some of the houses have been pulled down. He adds:

"I regard it in as good a condition as it is possible to get such a place.
It is only a mining camp and there is no pollution. The only pollution
that there can be is by washing over the surface."

Being asked why, if an epidemic should break out, the germs
would not be washed over the surface down into the brook and
from thence into the reservoir, he says

"that is possible. And it is possible of any place in the watershed, or
any single house in the watershed. I would state that a case of typhoid
fever has never been known in Hibernia and that the privy vaults are in
fair condition, so that even if there was a case or two, or three, there

would be no practical danger. Such a thing is not likely to happen, but the possibility cannot be denied for a moment."

As to this, Mr. Whipple says:

"If a case of typhoid fever should occur and the discharge of the basins enter the privy, it would be somewhat surprising if, through the agency of flies, the infection was not transferred to some other house or some other patients, or some other of the population there, and it would be a very easy matter for a severe epidemic to sweep through such a settlement as there exists. The conditions would be somewhat analogous to the conditions in some of the military camps of our soldiers during the Spanish war where typhoid fever did break out."

Now taking into consideration the class of persons inhabiting this camp, their utter ignorance of sanitary rules, the absence of police and sanitary supervision, the lay of the land and the character of the soil through or over which polluted liquids might flow into the brook, and the admitted fact that the waters of the brook are to some extent polluted at all times, it seems to me plain that if even a slight epidemic of water-borne disease should break out and some of the germs of disease be, as they would be likely to be, washed into the brook, they would quickly reach the river, and then it would be merely a question of conditions in the reservoir whether they would or would not settle or die before they passed into the effluent pipes at the gate-house.

As I have said before, Jersey City is entitled, under its contract, to an efficient mechanism for purifying the water, and there is no contrivance in the mechanism as constructed to guard against the dangers of Hibernia brook. Kuichling estimates that the total cost of pollution works, including a capital sum which at five per cent. would produce $900 a year for operating expenses, would be $46,000.

### *Mount Tabor.*

Mount Tabor is a summer camping ground. It lies about a mile and a quarter south of the river. There is a brook rising to the north of the hamlet, which flows into it. Here Mr. Whipple found sanitary conditions very much better than they

were in Hibernia. No sewer system, but, on the other hand, "No open privies, or only a few." These, as I understand it, do not drain naturally into the brook. The specific complaint, as appears from the testimony of Mr. Kuichling, is that the contents of the cesspools when emptied are dumped upon or near manure heaps within a few hundred feet or less of a water course or ditch, which finds its way into the brook. Dr. Herold says that there is no possibility of fecal matter getting into the stream, which is four hundred feet away; that the course of the polluted water is away from it, and that under existing conditions he cannot conceive of contamination or menace of contamination from this source. It appears to me that on the evidence nothing appears but the risk which is incurred from taking a water-supply from a densely populated watershed and which Jersey City assumed when she entered into the contract. The situation, too, is such that it is easily controllable.

### Boonton Drain.

The next question that I shall consider is the Booton intercepting sewer or drain. It is agreed on both sides that such a drain or sewer is necessary. Boonton is built on the steep sides of a hill, which to the west slopes toward the river. The defendants say that they have provided an open drain on the property of the Morris Canal and Banking Company. It is at present unnecessary to review the evidence bearing upon the question whether it is sufficient. It seems to be admitted that the water company has nothing but a license to maintain it, and it does not appear that this license is irrevocable. Until a better title is shown, I think that the company has not discharged its obligation.

### The Rag Mill at Powerville.

There is a considerable amount of evidence relating to this mill. It lies from one and a half to two miles above the reservoir, and formerly discharged a large amount of wastage into

the stream of such a character as to attract to it especial notice. The bill charges that the defendants are under contract to "eliminate" it. The defendants deny any such obligation and say that it is no longer a nuisance.

First, as to the legal question. It appears that the officials of Jersey City had during their tours of inspection seen this mill and that they thought it very objectionable. Prior to the signing of the contract of February 28th, 1899, Mr. Edwards, who was acting as counsel for the contractor, addressed this letter to the mayor:

"JERSEY CITY, January 6th, 1899.

*"Hon. Edward Hoos, Mayor, Jersey City:*

"MY DEAR SIR—When the sewer inspection was made of the Rockaway watershed under the pending proposal to my client, Patrick H. Flynn, to furnish a new water-supply to Jersey City, attention was called by his engineers to the rag factory at Powerville as among the possible sources of pollution. You were then told that it was the intention of the contractor to remove the same although no specific mention had been made of this place in the specification of the proposal. I beg to assure you that such removal has always been contemplated in our plans and that if the contract is awarded to him such removal must take place.

"Yours respectfully,

"WM. F. EDWARDS,

"P. H. FLYNN."

The letter as originally written was signed only by Mr. Edwards, but when the contract was ready for signature Mayor Hoos refused to sign it unless Flynn also signed the letter. This, after some little demur, he did, and then Hoos signed the contract. The water company's position is that the letter not being a part of the formal contract is not binding upon it. There is other testimony upon the subject, but I shall here only refer to that of Mr. William H. Corbin, which is the most favorable to the defendants' contention. He says that in a conversation between representatives of the city and of the water company, shortly before the water company undertook Flynn's obligations, reference was made (*inter alia*) to Mr. Edwards' promise to remove the rag mill, and that Mr. Gardner, the president of the company, said that he had examined the written contracts and specifications with great care and had made estimates upon them and if the parties he represented were to undertake the work at all, it would be on the basis of those written

contracts, and if there was any other understandings outside of those contracts by anybody he would have nothing to do with them and the negotiations might as well stop because those he represented would not undertake any contracts modified in any such way. To this Mr. Record, representing the city, replied that of course that was so and if the security company and the East Jersey Water Company came in they would, of course, be held to what the written contracts required and the city would not accept (require?) anything else. He says the subject dropped there and nobody again referred to the matter.

In this conversation the reference was not alone to the rag mill, but also to disposal works and other subjects on which the parties even then seem to have differed. I will assume that it was understood by both sides that the water company, if it undertook the work, would be bound by the written contract and by that only. What, then, was the written contract? It is elementary that a contract may be contained in more than one writing. If several papers are executed at the same time as parts of one transaction, they, together, constitute the contract.

The formal contract expressly declares that its provisions shall bind the assigns of Flynn and that the specifications and proposal are made part of it. The specifications contain this clause:

"The advertisement, the specifications, the *accepted proposals* and all maps, plans and drawings accompanying, attached to or described therein, the specific contract and the contractor's bond are to be considered essential portions of the complete contract."

Now, it seems to me, that the undertaking contained in the Edwards-Flynn letter was a proposal of Flynn accepted by the city, and, therefore, one of the accepted proposals mentioned in the above clause. It conclusively appears from Mr. Corbin's testimony that the water company had notice of it. As it was agreed on all hands that the writings were to be regarded as declaring the extent of the company's liability, and as this was one of them, it bound the company just as any other writing did.

But this does not solve the question presented. The evidence shows that acting under the suggestion of Dr. Leal, who told them that they were throwing away that which could be utilized,

the proprietors of the mill stopped pouring their waste into the river. It is no longer a menace in any other sense than any factory along the river bank having wastage to deal with is. There is always a possibility that the desire to get rid of it in the easiest and cheapest way, or carelessness or disobedience of orders, may result in pollution. But there is no law that forbids the establishment of factories along streams used for a water-supply. If the rag mill is now objectionable, so are the factories along the river bank in Dover, Rockaway and Boonton. The agreement contained in the letter is to "remove" the mill. It is possible' that the water company could purchase it at such a price as the owners might see fit to ask for it, but it may be doubted whether it could be condemned as a whole if it could not be shown to be a nuisance. I have no doubt that Jersey City may condemn a strip of land along the river banks for the purpose of preserving the purity of its water-supply. I think it could condemn a strip of suitable width for the purpose of guarding that supply, without any proof of present nuisance, but I should doubt whether it could condemn a factory property in its entirety extending back a considerable distance from the stream *merely* because it was a factory property situate on the river.

Assuming, then, that the letter of the promise has been broken, what is the consequence? The removal of the mill was stipulated for that the purity of the supply might be conserved. If the city gets a supply free from the pollution caused by the operation of the works in an objectionable way, the substantial object has been attained; the abatement of the nuisance has been effected. Even if the owners should consent to sell, they might take the money, establish themselves anywhere else along the river and continue the same business in the same way that they are now conducting it. Jersey City would be powerless to object unless they should begin to pollute it again. According to his promise, Flynn was obliged to *remove* the factory. Suppose he purchased it—there is nothing in the contract that would have obliged him to convey it to the city. Why, then, should the city have the price or value of this factory deducted from the price of the works? I am of the opinion that relief in respect of this should be denied.

I have now reviewed the principal sources of pollution mentioned in the bill. I do not think it necessary to notice in detail any of the others. The evidence does not satisfy me that they are at present polluting the stream. If they shall do so in the future they may be enjoined on the very salutary principle established in *State Board of Health* v. *Diamond Paper Mills, 63 N. J. Eq. (18 Dick.) 111; on appeal, 64 N. J. Eq. (19 Dick.) 793,* a case which decides that the prohibition is against putting any polluting matter into any stream or tributary which furnishes a water-supply at any point whatever above the point at which the supply is taken, and without any reference to the question whether the stream appears to be or is in fact polluted at the point of intake.

I may add that I am very strongly impressed with the conviction that, in view of the conditions prevailing on this populated watershed, Jersey City ought, at the earliest opportunity, to secure as much of the river banks as possible in those districts where the population is still inconsiderable and the land cheap.

### Watchung Tunnel.

I shall now consider some objections of a different character. The Watchung tunnel is thus referred to in the bill. The defendants cannot convey the works as provided in the contract

"because in constructing a tunnel through the Watchung mountain the defendants adopted a method of construction which was cheaper than that required by the contract. That your orator is entitled to an abatement of the consideration of the contract to the extent of the amount saved by the defendants in constructing their tunnel in a manner different from that required by the contract."

In what this difference consists the bill does not state. In the testimony, however, it is said to lie in the fact that the contractor has furnished a gravel and not a concrete bottom. To the bottom thus provided two objections are made, viz.—*first,* that because of the added friction the flow of water is slightly less; and *second,* that it is harder to clean. Both of these objections are substantial, if valid. The question, then, is whether the bottom,

as constructed, conforms to the contract. The specification reads as follows:

"Where the tunnel is in rock, if the bottom consists in sound and solid rock, it *may* be leveled up and smoothed and made uniform throughout with Rosendale cement concrete, surfaced with a layer two inches thick of Portland cement mortar. Where the tunnel is in earth or unsound rock, a brick invert sixteen inches thick *shall* be laid at the bottom. If it shall be necessary in order to secure a firm foundation, the invert shall be laid upon a bed of concrete."

If this were the only provision on the subject I should say that, having regard to the employment of the word "may" in the first part of the clause, and the word "shall" in the latter part, it was open to the contractor to resort to any permissible mode of tunnel construction where sound and solid rock was encountered, subject, however, to the limitation found in the paragraph headed "Inspection:"

"Any workmanship or material not mentioned or described, which may be necessary to make the works constructed complete, *and in all respects of the best quality and efficiency* shall be furnished and performed by the contractor as fully and thoroughly as if the full details and specifications therefor had been given therein."

Now, as to the method of construction adopted. Mr. Kuichling says that in no water works conduit that he knows of is there a gravel bottom. Without, apparently, denying the statement in this form, Mr. Gardner says, that the job is as good and serviceable a one as if it had been built with a concrete bottom, and Mr. Waldo Smith says that it (I suppose he refers to the invert) has been done in a proper way, and that it is a good engineering structure. Mr. Hering does not express any opinion. From this testimony, I should infer that in the absence of contract stipulations to the contrary, the mode of construction actually adopted was, from an engineering standpoint, permissible. I should doubt whether it was "of the best quality and efficiency." But there are two other clauses which bear upon the matter—*first,* the last part of the section that relates to tunnels: "Care shall be taken to leave the interior surface of the tunnel smooth and free from projections;" and *second,* the clause of plan No. 1, contained in the proposals: "Thence through

Watchung mountain by a tunnel, *brick-lined,* having an inside diameter equal to six and eighty-five hundredths feet." All three clauses must be read together, so reading them we having this:

"The tunnel is to be brick lined, but where the bottom consists of sound and solid rock it may be leveled up and smoothed and made uniform throughout with Rosendale cement and Portland cement mortar. In any case care shall be taken to leave the interior surface smooth and free from projections."

Now it seems to me that it is perfectly plain, in view of these provisions, that the only permissible departure from a brick lining *throughout* is, under the conditions named, a substitution of cement and mortar.

A gravel construction is excluded.

But it is argued that the tunnel furnished is as good and serviceable as a tunnel of brick or cement, The evidence is that because of the anticipated increase in friction, the horizontal and vertical diameters of the tunnel were enlarged two or three inches. The weight of the evidence (which is conflicting on this point) seems to be that this allowance is sufficient, but assuming that the tunnel, as built, will allow of the passage of seventy millions of gallons, in the manner stipulated, viz., so that "the upper surface of the water shall be one foot from the top of the arch," the defendants are still met by the difficulty that they have not performed their contract according to its terms, and that this mode of construction will make it more difficult and expensive to clean the bottom and free it from such vegetable and animal growths as are often, if not always, found in tunnels used for a similar purpose. The objection is not fanciful, and the city did not acquiesce in the mode of construction adopted; on the contrary, as soon as the company had submitted its amended plan to Mr. Ferris, as by the contract it was required to do, he, under date of January 16th, 1904, wrote to Mr. Harrison, the company's engineer, stating that he rejected the modified plans as not conforming to the specifications "inasmuch as the surface of the invert you propose will not be smooth and free from projection." Notwithstanding this rejection, the company went on in their own way.

Mr. Gardner testifies that they could not lay the cement because of the volume of water flowing through the bottom. By this statement he can mean only that they could not do it without going to the additional expense of putting in an underdrain. But if this were necessary in order to enable the company to perform the contract according to its terms, they would be obliged to make such an underdrain.

The city has elected to take the works. The case, therefore, comes within the rule laid down in *Bozarth* v. *Dudley, 44 N. J. Law (15 Vr.) 304,* and *Feeney* v. *Bardsley, 66 N. J. Law (37 Vr.) 240.* In this last case, Justice Van Syckel, speaking for the court of errors and appeals, approved the following direction: "If the contractor has substantially performed his contract, even though he has failed to do so in some minor particulars, he is entitled to recover the contract price, less what will be a fair allowance to the owner to make good the defects in the performance of the contract." This rule seems applicable to the case in hand. The evidence is that the difference between the cost of a concrete bottom and a gravel one is $18,500.

### Dam No. 1.

The city's next contention is that the main dam, while properly constructed to retain a supply of fifty millions of gallons, for the requisite number of days, has not been constructed in such a way as that, by simply building on top of it, it may be raised so as to provide for a supply of seventy millions.

The defendants' contention is that the contract does not oblige it to do anything more than construct a dam which shall hold back the fifty million gallons supply. It appears to me that the defendants' contention, in this respect, is correct.

The specification contains this clause:

"Bidders must also state a price for which the city can buy and own the water works of the capacity of fifty (50) million gallons daily, together with the water-supply, water rights, lands, reservoir sites, rights of way and all assessments necessary to fulfill the requirements of this specification and to the extent of seventy (70) million gallons daily."

In compliance with this specification, the proposal was as
follows:

"For the water works and all appurtenances thereof, necessary to fulfill
the requirements of these specifications to the extent of fifty million
gallons of water daily, together with the water-supply, water rights, lands,
reservoir sites, rights of way and all assessments necessary to fulfill
the requirements of these specifications and to the extent of seventy mil-
lion gallons of water daily forever, which purchase can be made by the
city when the water works are completed and accepted hereunder, pro-
vided the city shall give notice of its intention to purchase within one year
after the date of contract," &c.

In these two clauses a very sharp distinction is drawn be-
tween the works necessary to provide a supply of fifty millions
of gallons and the water-supply, water rights, lands, sites, &c.,
necessary to enable the possessor, at some period in the future,
to enlarge the supply to seventy millions. Counsel has not
been able to point to a single clause in any of the writings
which go to make up the contract, which requires that in the
construction of the dam, work must be done, not for the pur-
pose of providing a fifty-million gallon supply, but for the
purpose of partially providing for a seventy-million gallon one.
Failing to find any such provision in the writings, the city
falls back upon a correspondence between Mr. Ferris, city engi-
neer, and Mr. Harrison, the company's engineer, relative to the
Parsippany dike—a distinct structure in another part of the
reservoir—the result of which was that the company agreed to
the city's position in relation to that structure. A perusal of Mr.
Ferris' letter, found on page 157, shows that the situation in
regard to the dike differed considerably from that at the dam.
Mr. Ferris shows that the dike could not have been raised to
the seventy-million gallon level if constructed as Mr. Harrison
was then proposing to construct it. The core wall would then
have been in the wrong place and if an additional dike with
another core wall were to be constructed, the new work, in view
of the necessary excavations, would have imperiled the safety
of the original dike. Such, at least, was Mr. Ferris' contention.
Now, it may well be that the contractor was obliged to so con-
struct the reservoir intended in the first instance for a fifty-
million gallon supply, that the structure could, without im-

periling that supply, be adapted to a seventy-million supply. At all events, Mr. Ferris' representations on this head were so positive and so plausible that the water company gave in to them. But these considerations do not apply to the face of the dam. It is the opinion of all the engineers that that face may be thickened and strengthened on its lower or outer side without at all interfering with the work of the reservoir. Mr. Kuichling himself testifies as follows:

"I will say, to thicken the dam as built to an equivalent strength, that it would have to be, if built originally to the greater additional thickness, would require more masonry and it might possibly be done with a little more than the same masonry, but at very much larger additional cost, because the union between the old and new masonry must be made in expensive manner, therefore there would be a question of the value of the additional work as compared with the additional masonry."

I need not multiply quotations, for this is the statement of the city's expert. The increased cost is perfectly irrelevant if the contract itself did not require more than a dam capable of containing the fifty-million gallon supply. The only clause in all the writings to which counsel has been able to point is that which relates to *raising* the dam in the event that the city should, during the term of the contract, notify the contractor to increase the capacity of his works. This notification was never given. On the contrary, the city elected to purchase. Consequently, the clause has no relevancy to the present discussion even if it could be construed to mean that the contractor was merely to put his material nowhere else than on top of the present dam, a construction that not only seems to be inadmissible in itself, but was never contended for by Mr. Ferris so far as the dam is concerned.

There is, besides, absolutely nothing in the contract which indicates that the city, if it wished to increase the supply, might not think it better to construct an independent reservoir, for example, in the Longwood valley, or in some other locality above Dover, where the water would be less exposed to contamination. The construction of two or more reservoirs is not only usual in the case of a large city, but commendable. The contract itself contemplates the possibility of such a thing. From whatever

13

point of view the matter is considered, there is absolutely nothing that suggests an obligation to do more than provide a dam suitable for a fifty-million gallon supply.

### The Morris Canal and Banking Company.

I shall not attempt under this head to do anything more than outline the objection to the title of the Jersey City Water-Supply Company, founded upon the claim of the Morris canal company of a prior right to the flow of the Rockaway above Boonton. The city takes a position with regard to this claim which seems to me to be quite inconsistent with its status as party complainant praying for a specific performance. It seeks in the same breath to have the contract performed and repudiated.

Briefly outlined, the facts are these: By the original contract of February 28th, 1899, Flynn contracted to give "the whole flow of the Rockaway river having a watershed and gathering grounds of one hundred and twenty-two and a half square miles." On April 24th, 1901, Messrs. Corbin & Corbin addressed a letter to the Jersey City boards in which they stated that the canal company had the first right to use the waters of the river, and that Jersey City could obtain from the watershed "only such waters as remain after the needs of the canal are supplied, such needs being necessarily variable from year to year." In view of this claim, Flynn having (with others) failed to secure legislative consent to the abandonment of the Morris canal, procured an act of legislature, approved March 22d, 1901 (*P. L. p. 416*), in which it was provided that it should be lawful for the board having charge of the water-supply and the board having charge of the finances of any municipality to modify by resolution the terms of any contract heretofore or hereafter made by such municipality for the construction and purchase of a new water-supply

"as to area of the watershed or the proportion of the flow of any river or stream tributary thereto, or the capacity of the storage reservoirs thereof. Whenever, in the judgment of said boards, such modifications are needed to ensure the construction of the works provided such modification shall

not relieve the contractor or his sureties from furnishing and delivering to the municipality the quantity and quality of water required by the original contract."

Pursuant to this act the contract of July 8th, 1901, was made between the city, Flynn and the water-supply company. It recites the claim of the Morris canal and provides *(inter alia)* that in case, upon the completion and acceptance of the works, the claims of the Morris canal company and its lessee shall not have been released or extinguished, it shall be entitled to retain out of the purchase price of $7,595,000 the sum of $500,000 until the happening of one of three events—*first,* a decision of the highest court of New Jersey adverse to the claim; *second,* the delivery of a valid release from the canal company; *third,* the abandonment under legislative sanction of the portion of the canal lying between Dover and Montville and the surrender of its right to divert. This supplemental contract and two others, dated March 31st, 1902, conferred valuable rights upon Jersey City, and under them and under the original contract, so far as it remained unmodified, the water company, taking an assignment from Flynn, went on and constructed the works.

The city now contends that the contract of July 8th, 1901, was not warranted by the act of March 22d, 1901, and that (in the language of the bill) the defendants cannot convey the whole of said water works, * * * (*b*) because the defendants have not acquired the rights of the Morris canal to divert water from the water-supply about the reservoir at Boonton, that company claiming to have a right to divert such water to such an extent as will prevent the defendant. from furnishing the amount of water required by the contract.

While the city is not, apparently, satisfied with the contract deduction of $500,000, it wants specific performance with an undefined, and, I think, I may add, an unascertainable additional deduction from the contract price on account of the canal company's claim, which, however, both it and the water company disputes.

There is such a thing in equity as a deduction from the price stipulated, because of the inability of the vendor to give all that he has contracted to give, but here the claim is that this court

shall, in the absence of mistake, the parties having contracted exactly as they intended to contract, first, change the contract to the disadvantage of the water company, and then, in its changed form, compel them to perform it. If the water company was seeking to compel the city to take the works, Jersey City could set up the illegality of the contract (if it was illegal) for the purpose of defeating the suit. It is not entirely obvious why the supplemental agreement is not authorized by the terms of the act, but even if it be not, Jersey City, as a complainant, is hardly in a position to demand the specific performance of an agreement which it, in part, repudiates. If it may repudiate, it necessarily puts itself out of court. It is quite beyond the power of any court to compel parties specifically to perform on terms that they have never agreed to perform. The case is all the stronger for the reason that the agreement of July 8th, 1901, was as to the Jersey City water company the original agreement by which it first became bound.

I shall now notice very briefly one or two minor objections.

As to the steel pipes, it is sufficient to say that the contract does not provide for pipes seventy-six inches in diameter. It provides a formula according to which their carrying capacity shall be determined. When the site of the reservoir was changed and a greater head obtained it was possible, within the terms of the contract, to reduce their size.

As to the riparian owners below the reservoir, their rights are inconsiderable and most of them have been obtained. It is admitted that what remain must be acquired.

The question of seepage under the Parsippany dike has been settled.

I think, in view of the provisions of the Fence act, the water company should make an allowance equal to one-half the cost of fencing.

I have now noticed all the questions raised by the bill. If any others have been raised by the briefs, they are in themselves comparatively insignificant, and not within the issues contained in the pleadings.